Joe Robert WESSON *v.* STATE of Arkansas

CR 94-822                                          896 S.W.2d 874

Supreme Court of Arkansas
Opinion delivered May 1, 1995

*Lea Ellen Fowler O'Kelley*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clementine Infante*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Linda Rabal and appellant Joe Wesson had been dating over a year, but because of Wesson's drinking, Rabal terminated the relationship with Wesson in the fall of 1992. Wesson made phone calls to Rabal both at her home and her office in a futile attempt to reconcile. During the early morning hours of November 15, 1992, Wesson damaged a car belonging to Rabal's overnight guest, and broke the door down to Rabal's apartment, confronting both Rabal and her guest. Wesson was arrested at the scene, and subsequently on April 7, 1993, plead guilty to misdemeanor charges of criminal trespass, criminal mischief, harassing communications and public intoxication. Afterwards, Wesson still continued to call Rabal at her home and work, and was observed in Rabal's apartment complex area.

On January 27, 1994, Wesson was charged with the felony of stalking Rabal during the period of April 20, 1993, through May 10, 1993. Wesson waived trial by jury, and was found guilty of stalking in the second degree. The trial court sentenced Wesson to five years imprisonment, and established conditions of probation for three years following his release. Wesson appeals from the trial court's interpretation of the stalking statute and from the sufficiency of the evidence.

Acts 379 and 388 of 1993 [Ark. Code Ann. § 5-71-229 (Repl. 1993)] created the offenses of stalking in the first and sec-

ond degree and also contained sections that amended the statutory offenses of harassment and terroristic threatening to make them Class A misdemeanors.[1] Stalking in the second degree, a Class C felony, is defined in relevant part as follows:

> [I]f [a person] purposely engages in a course of conduct that harasses another person and makes a terroristic threat with the intent of placing that person in imminent fear of death or serious bodily injury . . . . § 5-71-229(b)(1).

"Course of conduct" as used in § 5-71-229(b)(1) means a pattern of conduct composed of two or more acts separated by at least thirty-six hours but occurring within one year. In addition, the term "harasses" employed in § 5-71-229(b)(1) means acts of harassment as defined in Ark. Code Ann. § 5-71-208. Those parts of § 5-71-208 relevant here define harassment as follows:

> (a) A person commits the offense of harassment if, with purpose to harass, annoy, or alarm another person, without good cause, he:
>
> * * *
>
> (5) Engages in conduct or repeatedly commits acts that alarm or seriously annoy another person and that serve no legitimate purpose; or
>
> (6) Places the person under surveillance by remaining present outside his or her school, place of employment, vehicle, other place occupied by the person, or residence; other than the residence of the defendant, for no purpose other than to harass, alarm, or annoy.

Here, Wesson concedes his acts fell within the definition of harassment as that term is defined and employed in the stalking statute. Nonetheless, he contends the stalking law also uses the term "terroristic threat" when defining the crime of stalking, and therefore, the state was required to show he made an "actual threat" of death or serious physical injury to Rabal as contemplated under the terroristic threatening statute, § 5-13-301. In this respect, we point out that, in construing § 5-13-301,

---

[1]These acts made no changes in defining the harassment or terroristic threatening offenses.

the court of appeals held, with which we agree, that the statute does not require that it be shown that the accused has the immediate ability to carry out the threats. *Knight* v. *State*, 25 Ark. App. 353, 758 S.W.2d 12 (1988). In sum, Wesson argues an "actual threat" must be shown as an essential element of the crime of stalking, and the trial court erred in finding that the state proved that element.

First, we certainly agree that, under the plain terms of § 5-71-229(b)(1), stalking requires the perpetrator to make a threat with the intent of placing his victim in imminent fear of death or serious bodily injury. We disagree, however, with Wesson's contention that he did not make such a threat. In fact, our review of the record reveals that the evidence thoroughly supports Wesson did, in fact, threaten Rabal with both death and serious bodily injury. The evidence, introduced without objection, showed that from the time Rabal began breaking up with Wesson in late 1992, through May 10, 1993, Wesson called Rabal repeatedly. During that time Rabal changed her telephone number four times, but Wesson was able to obtain her unlisted number twice. Rabal testified Wesson told her in early April 1993, that he had thoughts of killing her but did not know whether to do it at her apartment or at her place of employment. Further, Rabal testified that she saw Wesson sitting in a truck at her apartment complex on Mother's Day weekend in 1993. Finally, Rabal testified that, during the evening of May 10, Wesson called her home eighteen times within a period of one and one-half hours before she finally disconnected her phone. She stated Wesson's call to her that evening was different from the others in that Wesson told her he was coming over to her apartment "right away" and he was going to hurt her. Rabal testified she became so frightened she sat up with a bat and Mace, and later bought a gun. She stated she expected Wesson to come that night to hurt her, and perhaps kill her.

The tapes of telephone messages showed that Wesson threatened repeatedly to show up at Rabal's place of employment, and said he would make her life miserable, ruin her, make it his business to destroy her, wreak havoc upon her, and hurt her badly. In one telephone call, Wesson left the following message: "You can go straight to hell, and I'm going to do everything that I can do in my power to hurt you, and I will do it." Wesson later left the message, "I'm very sorry that I ever met you in my life. You

better hope to God that I don't turn where I want to hurt you, because I can. I really can, and I will." Three days later, Wesson's tape-recorded message provided the following:

> For the last time, if you ever hang up on me again, will be absolutely the last time that you will ever [hang] up on [me] again, and I really appreciate the way that you're feeling right now with your new little life. But no one will ever love you like I loved you. So, you go on with those guys, and I'll come back, and I'll do what I have to do.

And the same day, Wesson was recorded in a different message as stating:

> Do it again [hang up on him], and then I'll do my damnedest to hurt you. I really will. God damn it, if you won't even speak to me after living with you for a year and a half, I'm going to set my path to hurt you.

■ Wesson argues the foregoing calls and messages were intended as threats to harm Rabal emotionally. Of course, a person's state of mind at the time of a crime is seldom apparent. *Tarentino* v. *State*, 302 Ark. 55, 786 S.W.2d 584 (1990). Since intent cannot be proven by direct evidence, the fact finder is allowed to draw upon his or her own common knowledge and experience to infer it from the circumstances. *Id.* Because of the difficulty in ascertaining a person's intent, a presumption exists that a person intends the natural and probable consequences of his acts. *Id.*

■ Here, the trial judge, in hearing the evidence above, reasonably found that Wesson intended to terrorize Rabal with threats of harm. While Wesson argues those threats were of emotional harm, the fact remains that Rabal had ended her relationship with Wesson and from her view, no emotional link existed with which Wesson could hurt Rabal. Coupled with Wesson's earlier repeated and threatening messages, Wesson's pronouncement to Rabal on May 10 that he was coming over to her apartment "right away" to hurt her at the very least supports the finding that Wesson intended to cause Rabal serious physical injury. Based on the foregoing, we hold substantial evidence existed to support Wesson's conviction for second degree stalking.

Affirmed.