Tony HARPER *v.* STATE of Arkansas

CR 03-1457 194 S.W.3d 730

Supreme Court of Arkansas
Opinion delivered October 7, 2004

*Leverett & Watts, PLLC,* by: *Mark D. Leverett,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Brad Newman,* Ass't Att'y Gen., for appellee.

Jim Hannah, Justice. A Pulaski County jury convicted appellant Tony Harper of capital murder and aggravated robbery. He was sentenced to a term of life imprisonment without parole for the capital murder, and a concurrent term of 360 months for the aggravated robbery. The charges arose from the shooting death of Little Rock taxi driver Leroy Johnson on December 17, 2002. Harper appeals, arguing that the circuit court erred in denying his motion to suppress his statement. He also argues that there is insufficient evidence to support his convictions for capital murder and aggravated robbery; alternatively, he argues that even if this court finds there was substantial evidence to support the verdict, the circuit court erred by sentencing him for both capital murder and the underlying felony. Finally, Harper argues that the circuit court erred in admitting into

evidence photographs of the deceased that were gruesome and in-
flammatory. We find no error and affirm. Our jurisdiction is pursuant
to Ark. Sup. Ct. R. 1-2(a)(2).

*Facts*

Detective John White of the Little Rock Police Department
testified that on December 17, 2002, he was called to investigate
the shooting death of taxi driver Leroy Johnson at 24th and
Monroe Streets in Little Rock. White contacted the cab company
and learned that Johnson had picked up his last customer at 923
McAlmont. White, Detective Eric Knowles, and another officer
went to that address. No one was at that address, so they canvassed
the neighborhood to see if anyone had called the cab company
during the night. At a nearby apartment building, the officers
found Arthur Culps, who told the officers that his next-door
neighbor, Tony Harper, had used his phone the night of the
murder. Detective White testified that according to Culps, on that
night, Harper was carrying a shotgun and talking about killing his
wife. White stated that Culps told him that he and Harper drank a
shot of whiskey. Further, White testified that Culps told him he
tried to prevent Harper from leaving the apartment because he
could tell that Harper was "clearly upset." White stated that Culps
told him that Harper eventually left the apartment, still carrying
the shotgun. White testified that at that time, he knew that
Johnson had been killed with a shotgun.

The officers approached the apartment next to Culps's as
Brenda Aldridge was leaving it. Aldridge told the officers that she
lived there with her boyfriend and Harper, and that both of them
were home. Aldridge knocked on the door, but no one answered.
Aldridge left, and the officers knocked several more times. Even-
tually, Harper opened the door, and he identified himself as
Jonathon White. Detective White testified that Harper was unable
to provide his date of birth, and he stated that Harper was acting
deceptive and evasive. White told Harper that he and the other
officers were there investigating a homicide.

White stated that he returned to his police car to run a check
on Jonathon White, but there was no information on anyone with
that name. Shortly thereafter, Aldridge returned and went back
into the apartment. Another woman, who the officers later learned
was Harper's mother, Ruby Humphrey, also arrived at the apart-
ment building. The officers again attempted to speak with Harper,
but he maintained that his name was Jonathon White. Detective

White stated that he told Humphrey he was investigating a homicide, and that eventually, she went into Harper's residence and told him he needed to tell the officers the truth. Subsequently, Harper revealed his true name. The officers then checked Harper's name and learned that there were outstanding warrants for his arrest; they arrested Harper based on those warrants.

In his statement to the police, Harper stated that on the night of the shooting, he called a taxi, and when the taxi arrived, Harper told Johnson, the taxi driver, that he did not have any money and offered Johnson drugs as payment for the ride. Harper stated that Johnson told him he wanted methamphetamine, but Harper told Johnson that he only had "powder, some rocks." Harper stated that he gave Johnson a gram of powder worth $50.00. Harper stated that when the cab stopped at his destination, Johnson gave him $10.00. At that point, according to Harper, he told Johnson repeatedly to give the powder back to him and keep his money. Then, Harper stated, Johnson grabbed the shotgun and it went off. Harper stated that he again asked Johnson for his money, and that he noticed Johnson reach under the driver's seat. Harper testified that he was about to drop the gun when again, the gun went off. He stated that after he busted a window in the cab with the butt of his gun, "I got my dope and I ran." Harper then ran to a friend's house and called his mother to come and pick him up. Harper stated that after his mother came to get him, he told her he had done something bad and that she needed to take the gun and get rid of it. Harper stated that he had no intention of robbing Johnson.

### Sufficiency of the Evidence

Preservation of Harper's right against double jeopardy requires that we consider his challenge to the sufficiency of the evidence before we consider alleged trial error even though the issue was not presented as the first issue on appeal. *Davis v. State*, 350 Ark. 22, 86 S.W.3d 872 (2002). In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Cummings v. State*, 353 Ark. 618, 110 S.W.3d 272 (2003). We will affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.* On review, this court neither weighs

the evidence nor evaluates the credibility of witnesses. *Kirwan v. State*, 351 Ark. 603, 96 S.W.3d 724 (2003).

Pursuant to Ark. Code Ann. § 5-12-103(a)(1) (Repl. 1997), a person commits aggravated robbery if he commits robbery and is armed with a deadly weapon or represents by word or conduct that he is so armed. A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another. Ark. Code Ann. § 5-12-102(a) (Repl. 1997). A person commits capital murder if "he commits . . . robbery . . . and in the course of and in furtherance of the felony, or in immediate flight therefrom, he . . . causes the death of any person under circumstances manifesting extreme indifference to the value of human life." Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997).

■ Harper first argues that this court's decisions in *Parker v. State*, 292 Ark. 421, 731 S.W.2d 756 (1987), and *Sellers v. State*, 295 Ark. 489, 749 S.W.2d 669 (1988), require reversal of his convictions. We disagree. In *Parker*, the appellant entered the victims' home with the intent to kill the victims. The State proceeded on a felony-murder theory, using burglary as the underlying felony to support the conviction. We reversed, stating: "For the phrase 'in the course of and in furtherance of the felony' to have any meaning, the burglary must have an independent objective which the murder facilitates." *Parker*, 292 Ark. at 427, 731 S.W.2d at 759. Similarly, in *Sellers*, the State proceeded on a felony-murder theory, using burglary as the underlying felony to support the conviction. The State attempted to distinguish the *Sellers* case from the *Parker* case, arguing that the appellant's intent on entering the victim's home was to assault and batter him rather than to murder him, thus there was an objective of the burglary, independent of the murder. We rejected the State's argument and stated: "[W]e cannot find a way to say that the murder facilitated the burglary if the assault and battery were the underlying offenses. We cannot say that the murder facilitated the assault and battery as it was the very culmination of them." *Sellers*, 295 Ark. at 493, 749 S.W.2d at 671.

■ Harper's reliance on *Allen v. State*, 310 Ark. 384, 838 S.W.2d 346 (1992), is also misplaced. In that case, we held that the trial court erred in giving the felony-murder instruction because the assault "was only in the furtherance of the murder, not some

other felony." *Allen*, 310 Ark. at 388, 838 S.W.2d at 348. In the present case, the State did not contend that the aggravated robbery was in furtherance of the murder; rather, the State contended that Harper caused Johnson's death in the course of, and in furtherance of, the aggravated robbery. Thus, *Allen* is inapplicable.

While Harper does not couch his argument in terms of whether there was an objective of the aggravated robbery, independent of the murder, he argues that there is no evidence in the record that he attempted to rob the victim, and that absent proof of the underlying felony, there cannot be a conviction for capital murder with an underlying felony. He argues that the only basis for a finding of aggravated robbery is circumstantial evidence, which in this case is not legally sufficient to convict him.

■■ The longstanding rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). The question of whether the circumstantial evidence excludes every other reasonable hypothesis consistent with innocence is for the jury to decide. *Id.* Upon review, this court must determine whether the jury resorted to speculation and conjecture in reaching its verdict. *Id.*

■■ A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence. *See Robinson v. State*, 353 Ark. 372, 108 S.W.3d 622 (2003). Intent to commit a robbery may be inferred from the facts and circumstances of the particular case. *Jenkins v. State*, 350 Ark. 219, 85 S.W.3d 878 (2002). In *Owens v. State*, 313 Ark. 520, 856 S.W.2d 288 (1993), we stated:

> As to the general rule concerning sufficient proof of the necessary "intent to rob," the principles espoused in *Grigsby v. State*, 260 Ark. 499, 542 S.W.2d 275 (1976), are applicable here. In relevant part the *Grigsby* court stated the following:
>
> > Where the robbery and the killing are so closely connected in point of time, place and continuity of action as to constitute one continuous transaction it is proper to consider both as a single transaction and the homicide as a part of the res gestae of the robbery. (cites omitted.) The sequence of events is unimportant and the killing may precede, coincide with or follow the robbery and still be committed in its perpetration. (cites omitted.)

*Owens*, 313 Ark. at 525, 856 S.W.2d at 292.

As pointed out by the State, the only account of what occurred in the cab prior to the shooting is the statement that Harper gave to police officers the morning after the shooting. According to Harper, he offered Johnson drugs as payment for the ride. Harper stated that he gave Johnson a gram of cocaine powder worth $50.00; however, when the cab stopped at Harper's destination, Johnson gave Harper only $10.00. The State contends that apparently, Harper wanted to be paid the full $50.00 for the cocaine or he wanted Johnson to return the substance to him, even though he claimed he gave the drug to Johnson as payment for the ride. Harper claimed that he and Johnson struggled over the shotgun, and that when Johnson grabbed the shotgun, it fired. Harper stated that as he was leaving the cab, the shotgun again fired.

The State contends that, even if Harper's account is accurate, his intent to commit a theft at gunpoint was established by his admission that he shot Johnson in order to reobtain the drugs that he had just given to Johnson in exchange for the ride and to get money from Johnson as payment for the drugs. We agree with the State's contention that the jury could infer that Harper shot Johnson in order to steal the drugs and money from Johnson, based on Harper's own account of what occurred.

 The credibility of witnesses is an issue for the jury and not this court. *Ross, supra*. The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Id.* We hold that there was substantial evidence to support Harper's conviction for aggravated robbery. We further hold that there was substantial evidence that Harper shot and killed Johnson during the course of, and in furtherance of, an aggravated robbery.

 Alternatively, Harper argues that if this court determines that there is substantial evidence to support the conviction for aggravated robbery, this court should nevertheless set aside his sentence for aggravated robbery because he cannot be sentenced for both capital murder and the associated felony. This argument is without merit. Separate convictions and sentences are authorized for capital murder and any felonies utilized as underlying felonies for the murder. *See* Ark. Code Ann. § 5-1-110(d)(1)(A) (Repl. 1997); *see also Walker v. State*, 353 Ark. 12, 21, 110 S.W.3d 752, 757 (2003). The circuit court did not err in sentencing Harper on both counts.

*Motion to Suppress*

 Harper contends that the confession obtained from him was taken while he was under the influence of intoxicants and drugs, which made him incapable of giving a voluntary and knowing waiver of his constitutional rights. He further contends that the confession was obtained through coercion and threats, primarily in the nature of threats made against his mother. In reviewing a circuit court's refusal to suppress a confession, we make an independent determination based upon the totality of the circumstances, *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003); *Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001), and we will reverse only when the circuit judge's finding of voluntariness is clearly against the preponderance of the evidence. *Trull v. State*, 322 Ark. 157, 908 S.W.2d 83 (1995). Conflicts in the testimony are for the circuit court to resolve, and again, we will not reverse unless the circuit court's finding is clearly erroneous. *Id.*

 A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001). In order to determine whether a waiver of *Miranda* rights is voluntary, this court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* This court has consistently held that relevant factors in determining whether a confession was involuntary are age, education, and the intelligence of the accused, as well as the lack of advice as to his constitutional rights, the length of detention, the repeated and prolonged nature of questioning, and the use of mental or physical punishment. *See, e.g., Pilcher v State*, 355 Ark. 369, 136 S.W.3d 766 (2003); *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998). Other relevant factors in considering the totality of the circumstances include the statements made by the interrogating officer and the vulnerability of the defendant. *Pilcher, supra; Hood v. State*, 329 Ark. 21, 947 S.W.2d 328 (1997).

 When an appellant claims that his confession was rendered involuntary because of drug or alcohol consumption, the level of his comprehension is a factual matter to be resolved by the circuit court. *Grillot, supra; Jones, supra.* In testing the voluntariness of one who claims intoxication at the time of waiving his rights and

making a statement, this court determines whether the individual was of sufficient mental capacity to know what he was saying — capable of realizing the meaning of his statement — and that he was not suffering from any hallucinations or delusions. *Grillot, supra; Jones, supra.*

White stated that when he encountered Harper, Harper understood what White was saying, and he seemed to understand the situation. White stated that Harper was steady on his feet. White testified that while he noticed the smell of alcohol in Harper's residence, he did not notice the smell of alcohol on Harper's person. After Harper was taken to the police station, Detective Knowles advised him of his *Miranda* rights, and Harper stated that he understood his rights. Knowles stated that Harper did not appear to be suffering from any delusions or hallucinations as he was speaking to the officer. White did note that Harper was sniffing during the interview; however, he testified that Harper started sniffing only after he began crying during his confession. Harper told the officers that he attended school through the ninth grade and had completed his GED in 1994. The circuit court heard the tape recording of Harper's statement, and a transcript of the interview was introduced.

Humphrey was also interviewed. White testified that he did not know if Harper had been told that his mother was being interviewed, but he denied telling Harper his mother would be arrested if he did not tell the truth. Knowles testified that after he interviewed Harper, he learned that other officers had interviewed Humphrey. He stated that he found out from other officers that Humphrey had taken the shotgun and thrown it in the river.

Harper testified that he had been drinking gin heavily the day and night before Johnson was killed. He also stated that he had been using cocaine that day. He stated that he had smoked "probably about three or four rocks of crack" and sniffed "probably an eight ball" of powder. Harper stated that he had a forty-ounce beer in his hand when the police officers came to his door.

Harper stated that he confessed when the officers threatened to arrest his mother and charge her with capital murder. He stated that detectives provided him with specific facts to include in his confession. Harper also testified when he made his statement, he was high on cocaine and sniffed throughout the entire interview.

After hearing the evidence, the circuit judge stated that while there was some evidence that Harper might have been ingesting drugs or alcohol at the time of the incident, the evidence showed that Harper voluntarily waived his rights, and that if Harper was suffering from any kind of impairment, that impairment was not such that it would prevent Harper from understanding what the officers were asking him and what was taking place. The circuit court also ruled that Harper's confession was not the result of coercion and denied Harper's motion to suppress the statement.

 The issue of whether the circuit court erred in denying Harper's motion to suppress turns on the credibility of the witnesses. This court has held that issues regarding the credibility of witnesses testifying at a suppression hearing are within the province of the circuit court. *Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001). "Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused since he or she is the person most interested in the outcome of the proceedings." *Branscum*, 345 Ark. at 30, 43 S.W.3d at 155 (quoting *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998), *overruled on other grounds by Grillot, supra*).

 The circuit court heard testimony from Harper that he was so incapacitated from alcohol and drugs that he could not have knowingly and voluntarily waived his rights. On the other hand, White and Knowles testified that Harper did not appear to be intoxicated, that he did not smell of alcohol, that he was steady on his feet, and that he was able to understand and respond to their questions. Further, the circuit judge listened to the tape of the interview, and so was able to hear for himself whether or not Harper sounded as though he were impaired by drugs or alcohol. *See Jones*, 344 Ark. at 689, 42 S.W.3d at 542. Clearly, the circuit court found the testimony of the police officers to be more credible than the testimony of Harper. We cannot say that the circuit court's decision on credibility was clearly erroneous.

 As for Harper's claim that his confession was coerced, again, the issue is one of credibility. Harper testified that he confessed because the officers threatened to arrest his mother. White denied telling Harper his mother would be arrested if Harper did not tell the truth. Knowles testified that at the time he was interviewing Harper, he was unaware that Harper's mother

was also being interviewed. Again, it appears that the circuit court found the police officers to be more credible than Harper. Viewing the totality of the circumstances surrounding Harper's statement, we cannot say that the circuit court erred in denying Harper's motion to suppress.

### Admissibility of Photographs

This court has repeatedly stated that when photographs are helpful to explain testimony, they are ordinarily admissible. *Smart v. State*, 352 Ark. 522, 104 S.W.3d 386 (2003); *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001); *Williams v. State*, 322 Ark. 38, 907 S.W.2d 120 (1995). Further, the mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient evidence to exclude it. *Smart, supra; Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). Even the most gruesome photographs may be admissible if they assist the trier of fact by shedding light on some issue, proving a necessary element of the case, enabling a witness to testify more effectively, corroborating testimony, or enabling jurors to better understand the testimony. *Smart, supra; Barnes, supra*. Other acceptable purposes are to show the condition of the victim's body, the probable type or location of the injuries, and the position in which the body was discovered. *Smart, supra*. Pictures may also be helpful to the jury by showing the nature and extent of wounds and the savagery of the attack on the victim. *Smart, supra; Bradford v. State*, 306 Ark. 590, 815 S.W.2d 947 (1991).

Harper contends that the circuit court erred in admitting into evidence photographs that were gruesome and inflammatory. Harper objected to the admission of two of the crime-scene photographs, State's Exhibits 2 and 4, during the testimony of Officer Mickey Holloway, a crime scene specialist for the Little Rock Police Department. During his testimony, Holloway explained that State's Exhibit 2, a photograph taken outside the cab, showed Johnson's "defensive position," as well as one gunshot wound near the elbow in his left arm and another gunshot wound to the face. Holloway stated that State's Exhibit 4, a photograph taken after the door of the cab was opened, showed the position of Johnson's body inside the car; further, Holloway noted that one of Johnson's legs was jammed between the door and the steering wheel as if Johnson were raising his leg.

During the testimony of Dr. Frank Peretti, the state medical examiner, the State offered photographs taken during the autopsy performed on Johnson's body. Dr. Peretti stated that it was his opinion that photographs taken during the autopsy would help the jury understand the nature of the injuries. Harper objected to the admission of two autopsy photographs. State's Exhibit 34 depicted the injuries to Johnson's left arm. State's Exhibit 35 was a picture of Johnson's face and depicted the gunshot wound to Johnson's left cheek.

Here, the circuit court determined that State's Exhibits 2, 4, 34, and 35 were not so inflammatory that they would prejudice the jury. Harper contends that none of the photographs were necessary to explain the testimony of any witness. We disagree. State's Exhibits 2 and 4 allowed the jury to see the condition of the body, the probable type or location of the injuries, and the position in which the body was discovered. State's Exhibits 34 and 35, the autopsy photographs, were used to corroborate the medical examiner's testimony.

Finally, Harper argues that there was no reason for the State to introduce close-up photographs of Johnson's injuries "since the heinous nature of the crime or the nature of the injury had no bearing upon the ultimate issue to be decided by the jury." He further states that the nature of the injuries, other than the fact that they caused the death of the victim, were of no relevance to this trial. Photographs showing the condition of the body are relevant, and it is not an abuse of discretion to admit them. *O'Neal v. State*, 356 Ark. 674, 158 S.W.3d 175 (2004). The circuit court did not abuse its discretion in admitting State's Exhibits 2, 4, 34, and 35.

### 4-3(h)

In accordance with Ark. Sup. Ct. R. 4-3(h), the transcript of the record before us has been reviewed for adverse rulings objected to by the appellant, but not argued on appeal, and no such reversible errors were found.

Affirmed.