## Michael LOWRY *v.* STATE of Arkansas

CR 05-395 216 S.W.3d 101

Supreme Court of Arkansas
Opinion delivered October 20, 2005

*The Cannon Law Firm, P.L.C.,* by: *David R. Cannon,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Brent P. Gasper,* Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. ■ Appellant Michael Lowry was convicted in the Saline County Circuit Court of one count of stalking in the first degree, one count of arson, and eleven counts of violating a protection order. He was sentenced to twenty years' imprisonment on the stalking charge and ten years' imprisonment on the arson charge, to be served consecutively, as well as one year in the county jail for each of the protection-order violations. Lowry appealed to the Arkansas Court of Appeals, which reversed on the grounds that the trial court erred (1) in denying his motion for continuance due to discovery materials being furnished by the State two days prior to trial, and (2) in allowing James Heath to testify during the State's case-in-chief when his name had not been provided as a witness before trial. *See Lowry v. State,* 90 Ark. App. 333, 205 S.W.3d 830 (2005). The State filed a petition for review of that decision, pursuant to Ark. Sup. Ct. R. 2-4(c)(ii), alleging that the court of appeals' decision conflicts with precedent from this court. We granted the State's petition. When we grant review following a decision by the court of appeals, we review the case as though it had been originally filed with this court. *See Watson v. State,* 358 Ark. 212, 188 S.W.3d 921 (2004); *Porter v. State,* 356 Ark. 17, 145 S.W.3d 376 (2004). We affirm the judgment of conviction.

The record reflects that Lowry and Sandra Lewellen were romantically involved off and on for a period of three years, from April 1999 to May 2002. During that time, Lowry also dated Rhonda Brassiere, to whom he was married at the time of his trial. Lowry's dating both women caused friction in his relationship with Sandra. As a result, Sandra broke it off with him numerous times, whenever she heard rumors that Lowry was seeing Rhonda.

Their final breakup occurred on May 28, 2002. On that date, Sandra went to Lowry's home to confront him, after she had heard Rhonda driving past her trailer, honking her horn, as Rhonda routinely did whenever she was on her way over to Lowry's. Sandra knocked on the door several times, but Lowry would not answer. She finally became so angry that she kicked-in Lowry's front door, which hit Lowry in the nose, causing it to

bleed. Lowry then dove at Sandra and began beating her. The two struggled for some time, but Lowry eventually pinned Sandra down on the ground, with his knee in her back. While he had her down, Lowry cupped his hand over her mouth and nose several times and said: "Go unconscious, Bitch." He then leaned down to her ear and told her: "I have a lighter . . . I will light your house, I will light your son's house, and I will light your mother's house with them in it[.]" When the police finally arrived on the scene, they broke up the fight and placed Sandra under arrest for breaking and entering.

Sandra received numerous injuries from her fight with Lowry, including several broken ribs. The following day, May 29, 2002, she applied for and was granted a temporary order of protection, prohibiting Lowry from having any contact with her or her children. Thereafter, Lowry proceeded to contact Sandra numerous times on the telephone; he also followed her a couple of times. On June 21, Lowry called Sandra and left a long message and then played her a love song. Also on that date, Lowry contacted Sandra's sixteen-year-old daughter, Kim Lewellen, and told her he just wanted to get in touch with Sandra to help her with the charges pending against her. At one point during the conversation, Lowry said: "I'm sorry, but I'm going to have to do this."

Later that same date, Kim and her boyfriend Dustin Tuberville bought a CD player and some speakers to install in Kim's 1993 Ford Escort. They had the CD player installed at the store, but Dustin and a friend installed the speakers later that evening while they waited for Kim to get off work.

While she was working, Kim received a visit from Lowry. He spoke with Kim briefly and gave her the engagement ring that he had previously given her mother. He then went out to the parking lot and spoke to Dustin. He made small talk about how Kim's car was running and then got into his truck to leave. Before he left, Lowry called Dustin over to his truck and told him that he never meant to hurt Sandra, but that she was the one that broke into his house and kicked-in his door. Lowry showed Dustin his black eye and also a bite mark that he received in the altercation with Sandra. As Dustin started to walk away, he heard Lowry say: "They're going to burn for this shit." Dustin reported this threat to Kim.

Later that same evening, Kim dropped Dustin off in Benton and returned home around 11:00 p.m. When she returned home, she called Dustin, and they talked until around 1:00 a.m., when

Kim went to bed. Shortly thereafter, both Kim and Sandra heard a loud noise and saw the bright light of flames outside their mobile home. They ran outside to find the front of Kim's car, which was parked right next to Sandra's car, engulfed in flames. They went to a neighbor's house and called 911. The fire eventually spread to Sandra's car. When police and fire personnel arrived on the scene, Sandra told them that Lowry had set their cars on fire.

The next incident occurred the following day, June 22, 2002. Kim and Dustin were driving in Kim's brother's truck when they saw Lowry in his truck in front of them at a stop sign. Dustin, who was angry from the night before, "flipped [Lowry] off." Lowry responded by pulling halfway into the parking lot of a nearby laundry mat, where he appeared to be making a phone call. Because he only pulled in halfway, he was blocking Kim's path. When she drove around him, Lowry pulled in behind them and began chasing them at a high rate of speed, remaining close to their bumper. Kim was scared and crying during the episode. Lowry finally backed off once they got about a mile from Kim's home.

On July 31, 2002, a little over a month after the car burnings and the high-speed chase, Sandra was leaving for work in the morning, when she noticed that someone had taken a knife and shredded her new patio furniture. One week after that, on the morning of August 6, Sandra again noticed damage to her property as she was leaving for work. On that date, she noticed Rhonda driving by her trailer, honking her horn, as was her routine. Sandra then heard a truck engine running outside her home. She thought that it was someone just easing their way through the trailer park; however, the truck did not pass by, but kept hanging around for a minute or two. She did not look outside to see who it was, because she was in a hurry to get to work. She finally heard the truck drive off. Moments later, as she was walking to her truck, which she had purchased to replace her burned vehicle, she noticed that the whole side of it had been "keyed," or scratched up by someone using a key or similar metal object. She called the police and filled out a report. While she was doing so, Rhonda drove back by her home. When she finished the report, Sandra drove off to go to work. At the bottom of the hill near her trailer park, she saw Lowry sitting in his truck. He pulled out in front of her and sped off. A little further down the road, he pulled over, got out of his truck, and was standing on the side of the street, waving his arms and laughing at Sandra as she drove by.

The final incident occurred the following day, August 7, 2002. As Sandra was again leaving for work, she saw Lowry sitting in a nearby parking lot. When she passed the lot, Lowry pulled out behind her and began to follow her. Sandra became frightened and called 911. According to Sandra, Lowry was riding so close to her rear bumper that he would have hit her if she had tapped her brakes. At one point, she noticed that Lowry was holding up a handmade sign that read, "Sandy I love you." Shortly thereafter, Deputy Richard Friend, of the Saline County Sheriff's Department, arrived and stopped Lowry. When he pulled in behind Lowry, he noticed movement in the cab of the truck and saw Lowry put his arm behind the seat. Friend asked Lowry about the sign he had held up, but Lowry denied any such sign. Despite his denial, the officer recovered the sign from Lowry's vehicle. He also recovered two guns and ammunition. Lowry later admitted that one of the guns was loaded and that he had unloaded it after being stopped.

## I. Sufficiency of the Evidence

Lowry's first two points on appeal are challenges to the sufficiency of the evidence to support his convictions for first-degree stalking and arson.[1] In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Stenhouse v. State*, 362 Ark. 480, 209 S.W.3d 352 (2005); *Davis v. State*, 362 Ark. 34, 207 S.W.3d 474 (2005). We will affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.* Additionally, we consider all the evidence, including that which may have been inadmissible, in the light most favorable to the State. *Hampton v. State*, 357 Ark. 473, 183 S.W.3d 148 (2004); *George v. State*, 356 Ark. 345, 151 S.W.3d 770 (2004).

When circumstantial evidence alone is relied upon, it must exclude every other reasonable hypothesis than that of the guilt of the accused, or it does not amount to substantial evidence. *Stewart v. State*, 362 Ark. 400, 208 S.W.3d 768 (2005); *Harper v. State*, 359 Ark. 142, 194 S.W.3d 730 (2004). The question of

---

[1] Lowry does not challenge his eleven convictions for violating a protection order.

whether circumstantial evidence excludes every other reasonable hypothesis consistent with innocence is for the jury to decide. *Id.* Upon review, this court must determine whether the jury resorted to speculation and conjecture in reaching its verdict. *Id.*

Before reviewing the proof presented below, we must address Lowry's argument that the record is insufficient in that it does not contain a transcript of the jury instructions given by the trial court or the written instructions themselves. The record in this case was reconstructed pursuant to an order issued by the court of appeals, and the hearing in the trial court was made a part of the record on appeal. During the reconstruction hearing, the parties agreed that the instructions given were the standard AMCI2d instructions for the offenses charged. They agreed further that defense counsel did not object to any of the instructions given and did not proffer any non-AMCI2d instructions. Accordingly, the record is sufficient for us to review the arguments now raised on appeal.

## A. *Evidence of Stalking in the First Degree*

Lowry first argues that there was insufficient evidence to support his conviction for first-degree stalking, under Ark. Code Ann. § 5-71-229 (Repl. 1997), which provides in pertinent part:

(a)(1) A person commits stalking in the first degree if he purposely engages in a course of conduct that harasses another person and makes a terroristic threat with the intent of placing that person in imminent fear of death or serious bodily injury or placing that person in imminent fear of the death or serious bodily injury of his or her immediate family and he:

(A) Does so in contravention of an order of protection consistent with the Domestic Abuse Act of 1991, § 9-15-101 et seq., or a no contact order as set out in subdivision (a)(2)(A) of this section, protecting the same victim or victims, or any other order issued by any court protecting the same victim or victims; or

. . . .

(C) Is armed with a deadly weapon or represents by word or conduct that he is so armed.

Under this provision, the State was required to prove that Lowry purposely engaged in a course of conduct to harass Sandra Lewellen and made a terroristic threat with the intent of placing her or her immediate family in fear of death or serious bodily injury, and that he did so in contravention of an order of protection or while he was armed with a deadly weapon or represented that he was so armed.

■ Appellant argues that there was insufficient proof that he made a terroristic threat during the time that the order of protection was in effect. The term "terroristic threat," is not defined in section 5-71-229, nor has it been defined in this court's cases interpreting that provision. However, we may glean its meaning from prior decisions from this court and the court of appeals interpreting the separate offense of terroristic threatening, Ark. Code Ann. § 5-13-301 (Repl. 1997). The conduct prohibited by section 5-13-301 is the communication of a threat with the purpose of terrorizing another. *Smith v. State*, 296 Ark. 451, 757 S.W.2d 554 (1988). *See also Mason v. State*, 361 Ark. 357, 206 S.W.3d 869 (2005). However, a terroristic threat need not be verbal. *Davis v. State*, 12 Ark. App. 79, 670 S.W.2d 472 (1984) (upholding a conviction for terroristic threatening where the defendant chased the victims in a car for over three miles and tried to run them into a ditch). Nor is it necessary that the threat be communicated by the accused directly to the person threatened. *Richards v. State*, 266 Ark. 733, 585 S.W.2d 375 (Ark. App. 1979) (upholding a conviction for terroristic threatening where the defendant told a third party that he'd better get the victim away from him or he would shoot the victim). Moreover, it is not necessary that the recipient of the threat actually be terrorized. *Smith*, 296 Ark. 451, 757 S.W.2d 554 (citing *Richards*, 266 Ark. 733, 585 S.W.2d 375). Finally, there is no requirement that it be shown that the accused has the immediate ability to carry out the threats. *Wesson v. State*, 320 Ark. 380, 896 S.W.2d 874 (1995); *Knight v. State*, 25 Ark. App. 353, 758 S.W.2d 12 (1988).

■ In the present case, the evidence demonstrated that following the issuance of the order of protection on May 29, 2002,[2] Lowry engaged in a course of conduct spanning more than two months in which he harassed and threatened Sandra Lewellen

---

[2] The May 29 order of protection was extended for a period of two years on July 8, 2002.

and her immediate family on at least three occasions. The first occurred on June 21, 2002, when Lowry apologized to Sandra's teenaged daughter Kim for something that he was "going to have to do," and was later overheard by Dustin Tuberville to say, "They're going to burn for this shit." Some seven hours later, Sandra and Kim awoke to find their vehicles on fire in their driveway only a few feet from their mobile home. The second threatening event occurred the following day when Lowry chased Kim at a high rate of speed through East End until the girl got close to her home. The third threat occurred on August 7, 2002, when Lowry waited for Sandra to leave for work and then pulled in behind her and proceeded to tailgate her while holding up a handmade sign and while armed with a loaded gun. These three incidents constitute sufficient evidence of a terroristic threat as provided in section 5-71-229. We thus affirm Lowry's conviction for first-degree stalking.

## B. Evidence of Arson

As for the charge of arson, Lowry argues that the evidence was insufficient to prove that the fire that burned Sandra's and Kim's cars was intentionally set. Arkansas Code Annotated § 5-38-301 (Repl. 1997) provides in pertinent part:

> (a) A person commits arson if he starts a fire or causes an explosion with the purpose of destroying or otherwise damaging:
>
> (1) An occupiable structure or motor vehicle that is the property of another person[.]

Lowry submits that there was only circumstantial evidence that the fire was actually set by someone. He urges that there was just as much plausible evidence that the fire was caused by an electrical short resulting from the installation of the stereo equipment in Kim's car earlier that day. He contends that the evidence presented by the State was not sufficient to overcome the common-law presumption against arson. *See Ross v. State*, 300 Ark. 369, 779 S.W.2d 161 (1989). He is mistaken.

The evidence showed that on the night of the fire, both Sandra and Kim heard a loud noise outside their window around 1:00 a.m. Kim testified: "I just heard a noise like 'whoosh' outside my bedroom window, and it lit up orange." Sandra described

hearing a "horrible loud roar." She explained: "It was just roaring. It was like if you threw gasoline on a fire, how it roars real loud. If it's a lot at one time." After she heard the roar, she observed that her window "was glowing." Sandra also testified that she smelled gasoline at the scene after the tow-truck driver hauled the cars away from the scene.

Richard Blair, the East End District Fire Chief, testified that although he was not able to determine the precise cause of the fire, he noted that Kim's vehicle was completely engulfed in fire, from the front of the hood to the firewall area. He indicated that the fire started at the front of the vehicle and was making its way back toward the passenger compartment. He stated that, in his experience, a gasoline fire makes a loud whooshing sound when it ignites and it burns quickly. An electrical fire, on the other hand, will start out rather small, especially in a low-voltage vehicle like Kim's, and would burn more slowly than a gasoline fire. The start of an electrical fire would sound more like a pop. Based on his experience, Blair opined that if a witness heard a whoosh sound, it would be more likely that the fire was started with gasoline or some other equivalent accelerant.

James Heath, the tow-truck driver who removed the burned cars from the scene, testified that when he loaded the vehicles onto his flatbed truck, he noticed that gas was pouring out of one of the vehicle's gas line onto the ground. He explained that he loaded the vehicles by hooking up a wench and lifting them from the rear, thus raising the gas tanks and causing the gas to pour out of the lines. He also stated that he could "smell gas for days" at the impound lot where he had towed the vehicles.

In addition to the foregoing, the State presented evidence showing that it was Lowry who started the fire. Deputy Tony Baugh, of the Saline County Sheriff's Department, and Reserve Deputy Christi Preator positively identified Lowry's truck as being parked in an area within walking distance of the scene and within minutes of the time the fire started. They testified that they were on routine patrol of the area when they saw the fire. On their way to the scene, they noticed a gold GMC pickup truck with a ladder rack parked on the side of the road, just down the hill from the fire. Baugh recognized the truck, but he did not initially recall the owner's name. They shined their spotlight on the truck and observed it for twenty or thirty seconds, during which time they noticed a person standing at the back of the driver's side wearing

jeans and brown and black hiking boots. They thought it was probably just someone relieving himself, and they headed on to the fire.

Once Baugh and Preator arrived at the scene, Sandra reported that Mike Lowry had started the fire. It was at that point that it occurred to Baugh whose truck he had just seen. Once he made sure that everyone was out of harm's way and that the fire was under control, he drove back down the hill to see if the truck was still there, but it was gone. A couple of hours later, the officers, along with Saline County Sheriff's Detective Jimmy Long, went to Lowry's house. There, they found the truck they had seen previously, and they noted that the hood was still warm. They also discovered in Lowry's bedroom the brown and black hiking boots they had seen with the truck.

Finally, there was evidence that only hours before the fire Lowry was overheard to say: "They're going to burn for this shit." There was also evidence from Sandra that during their fight on May 28, Lowry told her: "I have a lighter . . . I will light your house, I will light your son's house, and I will light your mother's house with them in it[.]"

■ The foregoing constitutes sufficient evidence that the fire of the two vehicles was purposely set by a person and that Lowry was that person. As stated above, to be substantial, circumstantial evidence need only exclude every *reasonable* hypothesis than that of the guilt of the accused. *Stewart*, 362 Ark. 400, 208 S.W.3d 768; *Harper*, 359 Ark. 142, 194 S.W.3d 730. Whether such evidence does exclude every other such reasonable hypothesis is for the jury to decide. *Id.* Because we conclude that the jury in this case did not need to resort to speculation or conjecture in reaching its verdict, we affirm the conviction for arson.

## II. Admission of Letter

For his next point on appeal, Lowry argues that the trial court erred in allowing into evidence a letter written by Rhonda Lowry to Sandra Lewellen. The letter was postmarked July 6, 2002, and reads: "Sandy, Thanks for cleaning the lake lot up. It looks real good. P.S. I do swallow." During the trial, Rhonda indicated that the letter was meant to be a dig of sorts at Sandra, because she had commented before that she did not want to be cleaning on the lake lot. The postscript was intended to answer a question posed by Sandra to Lowry when she discovered that he

was having a relationship with Rhonda. Lowry contends that the letter was not relevant because there was no evidence that he authorized, aided, or encouraged Rhonda to send it.

The State contends that this letter was relevant because it had a tendency to show a violation of the protection order and a course of harassing conduct by Lowry toward Sandra. Specifically, the State asserts that the letter is relevant because the order of protection prohibited Lowry from having even indirect contact with Sandra. Moreover, the State asserts that Lowry has failed to show how he was prejudiced by the evidence, as Rhonda admitted to writing the letter and explained the meaning of its content on cross-examination, without objection by Lowry.

The decision to admit or exclude evidence is within the sound discretion of the trial court, and we will not reverse a trial court's decision regarding the admission of evidence absent a manifest abuse of discretion. *Morris v. State*, 358 Ark. 455, 193 S.W.3d 243 (2004); *Martin v. State*, 354 Ark. 289, 119 S.W.3d 504 (2003). Nor will we reverse absent a showing of prejudice by the appellant. *Id.*

The record in this case demonstrates that the State sought to introduce the letter in its case-in-chief through Sandra's direct examination. Lowry objected, but the trial court allowed it. However, Lowry did not renew his objection when the State later cross-examined Rhonda about the letter's content and meaning. This court has held that even if an appellant makes a proper objection to the admission of evidence, he or she must preserve the argument by renewing that objection if the State subsequently attempts to introduce the same or similar evidence. *Baker v. State*, 334 Ark. 330, 974 S.W.2d 474 (1998); *Mills v. State*, 321 Ark. 621, 906 S.W.2d 674 (1995). Because Lowry failed to renew his objection to the letter's relevancy when the State later elicited the same or similar evidence, he failed to preserve his objection for our review. We thus affirm the trial court on this point.

### III. Evidence of Additional Instances of Property Damage

Lowry also argues that the trial court erred in admitting testimony from Sandra Lewellen regarding two incidents in which she discovered damage to her personal property. As with the previous point, he argues that the evidence was irrelevant because there was no proof to connect him to it. The first incident was the

damage to Sandra's patio furniture, which took place around the end of July 2002. The second incident was the "keying" of Sandra's truck one week later.

We agree with the State that even though neither incident could be directly connected to Lowry, the evidence had at least some tendency to show a course of harassing conduct by Lowry toward Sandra and her family. Especially that concerning the keying of Sandra's truck, as she testified that she heard Rhonda drive by her home right before she discovered the damage and then saw Lowry waving his arms and laughing at her immediately after she reported the incident to the police. We simply cannot say that the trial court abused its discretion in admitting the evidence.

### IV. Motion for Continuance

The next point Lowry raises on appeal is that the trial court erred in denying his motion for a continuance due to the State's having provided additional discovery materials to defense counsel two days prior to trial. The additional materials consisted of Lowry's cellular telephone records; a handwritten report from the fire inspector; a recorded statement given by Lowry to the police, a summary of which had been previously received by the defense; and a certified transcript of Lowry's bond hearing, which had previously been given to defense counsel in uncertified form. On appeal, Lowry only challenges the late discovery of the phone records and the fire inspector's report.

The record reflects that defense counsel sought a continuance on the ground that she would not have time to read the materials and go over them with her client in preparation for trial. The trial court denied the continuance, but told defense counsel that it would entertain a motion to exclude the materials as evidence in the event the State attempted to use them at trial. Defense counsel did not attempt to exercise this option at trial. Even so, Lowry now argues that his convictions must be reversed based on the denial of a continuance. We disagree.

This court has held that a prosecutorial discovery violation does not automatically result in reversal. *Smith v. State*, 352 Ark. 92, 98 S.W.3d 433 (2003); *Hicks v. State*, 340 Ark. 605, 12 S.W.3d 219 (2000). The key in determining if a reversible discovery violation exists is whether the appellant was prejudiced by the prosecutor's failure to disclose. *Id.* Absent a showing of prejudice, we will not reverse. *Id; Rychtarik v. State*, 334 Ark. 492, 976

S.W.2d 374 (1998). Under Ark. R. Crim. P. 19.7, if the trial court learns that a party has failed to comply with a discovery rule, it may exercise any of the following options: (1) order the party to permit the discovery or inspection of materials not previously disclosed; (2) grant a continuance; (3) prohibit the party from introducing the material; or (4) enter another order that the court deems proper under the circumstances. *Id.* The choice of an appropriate sanction is within the trial court's discretion. *Id.*

Here, the trial court chose the third option, informing defense counsel of its willingness to consider a motion to prohibit the State from introducing any of the materials as evidence at trial. The choice of this option was within the trial court's sound discretion. In any event, Lowry has not demonstrated how he was prejudiced by the late discovery. The record demonstrates that the State never attempted to introduce the fire inspector's report. Likewise, the State made no attempt to introduce Lowry's cellular telephone records until after Lowry himself referenced the records in his direct examination. Moreover, we agree with the State that there could be no prejudice from the admission of the phone records because they were Lowry's own records. This court has held that the prosecution is not required to disclose information that is already accessible by the defendant. *See Johninson v. State*, 317 Ark. 431, 878 S.W.2d 727 (1994). We thus affirm the trial court's ruling on this point.

### V. Rebuttal Witness

For his final point on appeal, Lowry argues that the trial court erred in allowing James Heath, the tow-truck driver, to testify in the prosecution's case-in-chief even though he was not previously revealed as a potential witness. The State argued that it had no obligation to reveal Heath's name prior to trial because he was a rebuttal witness, whose testimony would be used to rebut any attempt by the defense to assert that Sandra Lewellen had poured gasoline on her property after the police and fire personnel had left the scene of the fire to show that the fire was purposely set. The trial court agreed with the State that Heath was a rebuttal witness who did not have to be disclosed prior to trial. However, the trial court allowed Heath to testify in the State's case-in-chief because defense counsel had opened the door to his testimony during opening statement.

The purpose of rebuttal evidence is to respond to evidence presented by the defense. *Robinson v. State*, 353 Ark. 372, 108 S.W.3d 622 (2003); *Pyle v. State*, 314 Ark. 165, 862 S.W.2d 823 (1993), *cert. denied*, 510 U.S. 1197 (1994). If a witness is properly a rebuttal witness, the State is not required to disclose his or her identity before trial. *Id.* In *Chenault v. State*, 253 Ark. 144, 484 S.W.2d 887 (1972), this court held that it was error for the State to present evidence of the deceased's good character in its case-in-chief; however, the error was made harmless because the defense had raised the issue of his bad character during opening statement and then pursued such evidence on cross-examination. This court held: "Although, in the present case it was erroneous to permit the introduction of character testimony at the time it was introduced, *the defense in pursuing her evidence as outlined in her opening statement to the jury, made the error harmless.*" *Id.* at 147, 484 S.W.2d at 889 (emphasis added). This holding is controlling of the issue in this case.

The record reflects that during her opening statement, defense counsel presented the theory that the charges against Lowry were not the result of his criminal behavior but were, instead, the product of a woman scorned. Her statement reflected in relevant part:

> [Detective Long] said that when they left there they went and because there was a gold truck involved and the other officer saw it, they went in and arrested Mike that night, got him out of bed and arrested him that night, that very night, left immediately from her house and went — got a call to go back out there and when they went back out there the smell of gasoline was so strong, there was gasoline all over the side of that trailer, all over the side of [Sandra] Lewellen's trailer. They were looking for accelerants. They were looking for gasoline, didn't see any gasoline out there when they first went out. But when they got called back out there [Sandra] Lewellen wasn't there, her daughter wasn't there. Kim — Sandy's sister wasn't there that was there previously. Everybody was gone. But there was gasoline [poured] all over the trailer, something they didn't see the first time. They couldn't find any trace of accelerants the first time they went out there. It was just another attempt of a scorned woman trying to get even and trying to put him in jail because if she couldn't have Mike then nobody would.

The trial court ruled that counsel's statement had raised the inference that the Lewellens had poured gasoline on their own property to

make it look like arson. It thus allowed the State to present Heath's testimony that he noticed gasoline pouring out one of the vehicle's gas line when he loaded them onto his flatbed truck.

 Under our holding in *Chenault*, 253 Ark. 144, 484 S.W.2d 887, any error in allowing Heath to testify in the State's case-in-chief, even though he was a true rebuttal witness, was made harmless when defense counsel painted the picture of a woman scorned during opening statement, suggesting to the jury that the gasoline could only be smelled after the fire had been extinguished because Sandra intentionally poured gasoline on her own property to frame Lowry. Defense counsel then pursued this evidence on cross-examination of Detective Long.

 Additionally, we note that defense counsel made no objection when Sandra testified on direct examination to essentially the same observation that Heath would later testify about. Specifically, Sandra testified that she did not smell gasoline right away, not until "a little later that night." In response to the prosecutor asking her when she noticed the smell, she responded: "When the tow guy was pulling the cars off is when the gasoline smell was there." Heath's testimony was essentially cumulative to this. Accordingly, we cannot say that the trial court erred in allowing Heath to testify during the State's case-in-chief.

Circuit court affirmed; court of appeals reversed.