2012 Ark. App. 234

**Dominic McPEAK, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 11–812.**

Court of Appeals of Arkansas.

April 4, 2012.

**432**

Terrence Cain, and Jimmy C. Morris, Jr., Morris and Associates, P.A., Little Rock, for appellant.

Dustin McDaniel, Attorney General, Rebecca B. Kane, Assistant Attorney General, Little Rock, for appellee.

RITA W. GRUBER, Judge.

Dominic Anthony McPeak was convicted in a bench trial of two counts of aggravated assault and one misdemeanor count of fleeing, for which he was sentenced to ninety days' imprisonment in the Clark County Jail and five years' probation. The acts leading to the charges against him occurred around 2:00 a.m. on July 19, 2009, after law-enforcement officials answered a disturbance call to a party in Gurdon where fights had erupted and shots had been fired in a large crowd of people. McPeak was taken into custody that afternoon at a hospital in a nearby county where he was treated for bullet wounds he sustained while running from officers. He raises two points on appeal, contending that the trial court erred in denying his motion to suppress his custodial statement and denying his challenge to the sufficiency of the State's evidence on the aggravated-assault charges. We affirm.

McPeak asserts that despite his completing the confinement portion of his sentence, his case is not moot for appellate review because of the collateral consequences that attend a felony conviction. The State concedes the point, and we agree. *See Pennsylvania. v. Mimms,* 434 U.S. 106, 108 n. 3, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (citing prior United States Supreme Court cases holding "that the possibility of a criminal defendant's suffering 'collateral legal consequences' from a sentence already served permits him to have his claims reviewed here on the merits"); *Ginsberg v. State of N.Y.,* 390 U.S. 629, 633 n. 2, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (noting that "*St. Pierre* [*v. United States,* 319 U.S. 41, 43, 63 S.Ct. 910, 87 L.Ed. 1199 (1943)] also recognized that the case would not have been moot had 'petitioner shown that under either state or federal law further penalties or disabilities can be imposed on him as result of the judgment which has now been satisfied' ").

*Sufficiency of the Evidence*

The prohibition against double jeopardy requires that we review the sufficiency of the evidence prior to examining trial error. *Stewart v. State,* 2010 Ark. App. 9, 373 S.W.3d 387. McPeak's arguments concerning the sufficiency of the evidence center on the statutory requirement of aggravated assault that a person "[d]isplays a firearm in such a manner that creates a substantial danger of death or serious physical injury to another person." Ark.Code Ann. § 5-13-204(a)(2) (Repl. 2006).

McPeak attacks the testimony of Clark County Sheriff David Turner and Officer Christopher Russell of the Gurdon Police Department, asserting that they "both lied" in saying that he aimed and discharged a firearm in their direction. He asserts that neither of them actually saw

him point a firearm at anyone or threaten to use a firearm on anyone, arguing that Sheriff Turner saw him merely throw a gun away and flee, which was more than Officer Russell saw. McPeak points to conflicting evidence on this version of events. We ∣₃are unable to address the merits of this point because it is not preserved for appellate review.

■ Arkansas Rule of Criminal Procedure 33.1 requires a defendant to renew a motion for directed verdict or dismissal at the "close of the case" in order to preserve for review any question pertaining to the sufficiency of the evidence to support the jury verdict.[1] To preserve for appeal the issue of the sufficiency of the evidence in a criminal case, the appellant must move for a directed verdict both at the close of the State's case and at the close of the whole case. *King v. State*, 338 Ark. 591, 999 S.W.2d 183 (1999). Thus, the requirement of Rule 33.1 to renew the motion at the "close of the case" obligates the defendant to renew it again at the close of any rebuttal case that the State may present. *Id.*

McPeak moved "for a directed verdict" at the conclusion of the State's case, arguing in part that there was no proof he aimed the gun at either of the two officers and that his running with a gun was "not purposeful towards injuring or harming someone." He renewed his "motion for directed verdict or dismissal" after the defense rested, again arguing that the State had failed to meet its burden of proof related to displaying a firearm with manifest indifference to human life. The trial court denied each of McPeak's motions challenging the sufficiency of the evidence to support the two counts of aggravated assault. The case did not close,

however, until a rebuttal witness for the State testified and the State again rested. McPeak did not renew his motion to dismiss at that time, therefore failing to preserve for ∣₄appellate review the issue of sufficiency of the evidence.

### Custodial Statement

■ McPeak was admitted to the Dallas County hospital at 12:45 p.m.; afterward, he was taken into custody and jailed in Fordyce until being transported back to the Clark County Sheriff's Department. Once there, he signed a form waiving his *Miranda* rights and submitted to an interview at 6:25 p.m. He admitted in the statement throwing down a gun—which he said he took from a stranger when shots were fired—after law-enforcement officers arrived. He denied ever pointing or firing the gun at anyone, and he said that officers chased him while the crowd yelled, "Don't shoot." He admitted running from the officers. McPeak contends on appeal that his statement was involuntary.

McPeak asserts that his statement was given following surgery, and the resulting pain rendered him incapable of voluntarily, knowingly, and intelligently waiving his right not to speak. He points to his testimony at the suppression hearing that he sought treatment in Fordyce because he feared Clark County officers after their unprovoked use of deadly force against him. He complains that his interrogators did not offer him pain medication during the interview despite knowing of his surgery only six hours earlier, and he relies upon his testimony that the pain, lack of sleep, and fear of being shot again influenced his decision to talk. He argues that the State did not prove that he had recov-

---

1. McPeak moved for directed verdicts at the close of the State's evidence and moved for directed verdict or dismissal when the defense completed its case. A challenge to the sufficiency of the evidence in a bench trial is properly termed a motion to dismiss. *Lawshea v. State*, 2009 Ark. 600, 357 S.W.3d 901; *see* Ark. R.Crim. P. 33.1(b) (2011).

ered from the effects of the shooting, the local anesthetic administered prior to surgery, the surgery itself, and any potential side effects from the pain medication.

A statement made in custody is presumptively involuntary; the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Harper v. State,* 359 Ark. 142, 194 S.W.3d 730 (2004). In order to determine whether a waiver of *Miranda* rights was voluntary, the reviewing court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.*

In reviewing a circuit court's refusal to suppress a confession, we make an independent determination based upon the totality of the circumstances and will reverse only when the finding of voluntariness is clearly against the preponderance of the evidence. *Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003); *Harper v. State,* 359 Ark. 142, 194 S.W.3d 730 (2004). Conflicts in testimony are for the trial judge to resolve, and the evaluation of the credibility of witnesses testifying about circumstances surrounding an appellant's custodial confession is for the trial judge to determine. *Flowers v. State,* 362 Ark. 193, 208 S.W.3d 113 (2005). So long as there is no evidence of coercion, a statement made voluntarily may be admissible against the accused. *Id.* Relevant factors in determining if a confession was voluntary are the accused's age, education, and intelligence; the lack of advice regarding his constitutional rights; the length of the detention, and the repeated and prolonged nature of questioning; statements by the interrogating officer and the vulnerability of the defendant; and the use of mental or physical punishment. *Id.; Sanford v. State,* 331 Ark. 334, 962 S.W.2d 335 (1998).

When an appellant claims that his confession was rendered involuntary because of drug or alcohol consumption, the level of his comprehension is a factual matter to be resolved by the circuit court. *Harper, supra; Grillot, supra.* The test for voluntariness of one who claims intoxication at the time of waiving his rights and making a statement, is whether the individual was of sufficient mental capacity to know what he was saying—capable of realizing the meaning of his statement—and that he was not suffering from any hallucinations or delusions. *Jones v. State,* 344 Ark. 682, 42 S.W.3d 536 (2001). It is significant in a finding of voluntariness that the accused answered questions without indications of physical or mental disabilities, that the accused remembered a number of other details about the interrogation even though he could not remember waiving his rights, and that a statement was given in a short period of time after his rights had been read to him. *Id.*

The State's sole witness at the suppression hearing was Dennis Morris, an Arkansas State Police criminal investigator who took McPeak's statement. McPeak also testified at the hearing. Introduced into evidence through Morris's testimony were a *Miranda* rights form, initialed and signed by McPeak, and witnessed by Morris and Special Agent David Rider; a forty-nine minute CD audio recording of McPeak's Fifth Amendment rights waiver and his statement regarding events that occurred earlier that day; and a reporter's transcription of the audio statement, which was played in the courtroom.

Morris testified that he advised McPeak of his *Miranda* rights and, along with Agent Rider, took McPeak's statement at 6:25 p.m. in the Clark County Sheriff's office after McPeak was transported there from Dallas County. According to Morris,

McPeak had no questions about the rights he was advised of and did not appear to be under the influence of any intoxicant, unaware of his surroundings, or to not understand his rights. McPeak appeared to be "very coherent," no threats or coercion were used to obtain his waiver, and when Morris inquired about how much he had drunk before the events in question, he replied that it was two beers. Morris asked if McPeak had been intoxicated, to which he replied, "Oh, no, I was not." Morris discussed the removal of a bullet or bullet fragment from McPeak's left biceps area and a wound through the flesh close to the right hip area, which McPeak showed him. Morris described McPeak as cooperative, very nice, smart, very sharp, and with quick answers, although he relayed some fear of police officers as the reason he had not wanted to turn himself in at Clark County. Morris said that McPeak did not complain of pain, and that Morris did not ask if he had been given anesthesia, medication, or any more alcohol that would affect his mental state.

McPeak testified that the following events occurred after police arrived at the party around 2:00 a.m. on July 19. McPeak was shot, got away, went to the back of his father's house to catch his breath, and was picked up by his sister, who took him to Fordyce. McPeak did not want to be turned in to Clark County police officers because they had just shot him. He arrived at a hospital in Fordyce and was taken into surgery around noon because x-rays showed a bullet, or fragment, remaining in his arm. He was not put to sleep but was given a pill for his pain, which he ranked 7 on a scale with 10 the highest. The medication, which he could not name, reduced his pain to 4 or 5. He was a little drowsy but aware of what he was saying most of the time. Officers were in the x-ray room, probably twenty-five minutes before the surgery, and he

was released from the hospital to an officer who then took him to jail in Fordyce. According to a hospital record provided by the State, McPeak was admitted at 12:45 p.m. and discharged an hour and five minutes later.

McPeak further testified that he was given no more medication while remaining in jail for over an hour. He then was transported to Clark County, where another thirty minutes passed before he went to his interview. He got no sleep between the time he was shot and entered the interview, he did not want to sleep because of not knowing what was happening, and his only rest was from "dozing in and off." There were two officers present at the table, at least one with a gun; McPeak felt a little intimidated, and the medication was still affecting him a little. He said that he talked to the officers because he was scared, both before and after learning the charges against him, and that his talking to them was influenced by pain, medication, fear, and lack of rest.

McPeak stated on cross-examination that he recalled the interview, in which everything he told the officers was true. He recalled telling the officers about gunshots and multiple fights at the party before the police arrived, about taking the gun in question from an individual he did not know, and about his remaining at the party after the shots and fights. He testified that Detective Morris and Special Agent Rider did not threaten him, nor did they promise him anything in exchange for giving a statement. He described himself as cooperative and forthright with them during the interview.

After each party made closing arguments, the trial judge orally analyzed the issues regarding McPeak's custodial statement, first addressing the issue of whether the statement was voluntarily given with-

out coercion. Finding that the statement and waiver were in order and properly done, and noting Agent Morris's testimony that there was no coercion and McPeak's testimony that the police made no threats or promises, the judge found that the State had met its burden that there was no coercion.

The judge then turned to the remaining and more serious issue, addressing McPeak's argument regarding the circumstances of his case: that he was not capable of giving a valid statement because of the factors of medication, lack of rest, pain, and possibly alcohol. The judge traced the timeline from McPeak's being shot around 2:00 a.m.; transported to Fordyce; treated at the Fordyce hospital for more than an hour but less than two, between noon and 2:00 p.m., and receiving local pain medication but no general anesthesia; and transported to the Fordyce jail, where he was held until transported to Clark County for the 6:25 p.m. statement. The judge also discussed these factors:

> Mr. McPeak is a college-educated person, which puts him in a position to understand what is going on more than some of the defendants that we have in court. Mr. Morris testified that it was not his belief that Mr. McPeak was under the influence of some medication or alcohol or drugs. He described Mr. McPeak as being polite, being quick to respond to the questions, and, ... obviously intelligent ... observing him in this interaction when the statement was given. There was pain medication given, but I do not have any specific proof that it altered the Defendant's state of mind. I am not even sure what the medication was that was given or what dosages were given.

On the lack of rest, the judge found that missing a night's sleep, combined with an eventful and painful night, would not necessarily cause McPeak to lack understanding of what was happening. Addressing pain, the judge interpreted McPeak's testimony that his post-surgery pain was four or five to mean that the same level of pain existed at the time he gave his statement. The judge acknowledged McPeak's testimony that he had two beers before the shooting but found an absence of proof of "anything that would affect his judgment or ... sufficient interaction with drugs, alcohol, to make a difference." Based on all these factors and the evidence presented at the hearing, the judge denied the motion to suppress.

In reviewing a trial court's ruling on the voluntariness of a confession, we make an independent determination based upon the totality of the circumstances, and we defer to the trial court's superior position to resolve conflicts in testimony. *Grillot, supra; Flowers, supra.* In light of this deference and the evidence as summarized above, we cannot say that the trial court erred in finding that McPeak made a knowing and intelligent waiver of his *Miranda* rights and that his statement was voluntarily given and was not the product of coercion or deception.

Affirmed.

ABRAMSON and MARTIN, JJ., agree.