RITA W. GRUBER, Chief Judge
Steven Swanigan was convicted by a Garland County Circuit Court jury of one count of first-degree murder and two counts of first-degree battery for entering an apartment in Hot Springs and firing multiple gunshots killing Mayela Mata and injuring her twenty-month-old daughter and a friend, Antouin Bond. On recommendation of the jury, the circuit court sentenced Swanigan to an aggregate term of 720 months' imprisonment. He raises six points for reversal. We reject them and affirm his convictions.
I. Facts
Mayela Mata and her fiancé, Terrence Scott, lived with their daughter, ES, in a townhouse apartment at 200 Springwood in Hot Springs. At around 5:00 p.m. on April 30, 2014, several people, including Terrence's friend Antouin Bond, were at the apartment when two masked men came to the door, and one rushed inside, opened fire, killed Mayela, and injured ES and Antouin.
Terrence Scott testified that Mayela and ES were in the living room and that he, Antouin, and Terrence's brother Joseph were preparing to smoke marijuana in the kitchen when Terrence saw a "tall, skinny, black male with some really distinguished eyes" come in holding two guns with extended clips. A bandana covered the man's face except for his "big ole bug eyes." The man said either "get down" or "lay down," and he immediately began shooting. According to Terrence, a second man was with the shooter, but Terrence did not know whether that man had a gun. Terrence *742 saw Mayela fall and saw part of her brain on the floor. After the shooter left, Terrence learned that Antouin and ES had both been shot. Terrence also testified that he had known Swanigan for twenty years and often saw him at Oaklawn Racetrack. Terrence said that Swanigan would "always be in Polo, you know, fresh starched clothes, Polo boots, Jordans."
Antouin described the shooter as a tall, slim man with dark skin. He said the shooter was holding two guns, and one of them had a long clip. He was not sure about the other gun. He said he believed the shooter spoke a few words before he began shooting. Antouin testified that he had been in school with Swanigan for only one year but had known him for about twenty years. Terrence's brother Joseph testified that the shooter had two guns, was very slim, and was wearing a hat and a bandana. He said that he had big eyes, "real bug eyes."
Natasha Jones testified that she and her husband lived in the apartment building right next to Terrence's building, about ten to fifteen feet away from Terrence's apartment. She said that at the time of the incident, she was upstairs in her bedroom and heard what sounded like fireworks outside. She looked out her blinds to check on her son, who was outside playing, and saw a white car with a blue top directly below her window. She said she saw a skinny, dark arm holding a black gun out of the passenger side window. According to Natasha, the car appeared to have a busted oil pan and it started to stall on its way out of the apartment complex. She heard screaming and went to Terrence's apartment where Terrence handed ES to her. She said that ES had a gunshot wound that went through her back and out her front near her left lung and heart and there was blood coming out of her mouth. Natasha's husband called 911.
Criminal investigator Russ Rhodes with the Arkansas State Police testified that he arrived on the scene at 5:37 p.m. He said that he saw what appeared to be automotive fluid in the driveway of the parking lot. He also described the items collected at the scene, which included a .40-caliber spent shell casing to the right of the front door, three nine-by-eighteen Makarov shell casings inside the front door, and several .40-caliber TulAmmo shell casings inside the front door and on the couch.
Jennifer Floyd from the State Crime Laboratory examined the ammunition found at the scene. She testified that the three expended TulAmmo .40-caliber cartridge cases had all been fired from the same gun. She also said there were three spent 9-millimeter Makarov caliber Hornady cartridge cases, all fired from the same gun.
Officer Corwin Battle, a special agent with the Arkansas State Police, testified that he recovered the surveillance video of the apartment parking lot for the time of the incident. He testified that the video depicted a Cadillac driving up to the apartment complex, two males getting out, one going inside Terrence's apartment, and the other stopping at the door. The video shows both men running to the car, jumping in, and leaving. The video was introduced into evidence and played for the jury. The video shows that there is no fluid in the parking space before the Cadillac drives up. After the Cadillac leaves the parking space, there is what appears to be a trail of fluid and the car can be seen as it stalls, tending to confirm Natasha's testimony about the Cadillac.
Deputy Phil Fisher of the Garland County Sheriff's Department testified that he had been dispatched to 115 Oak Hill in Hot Springs on an unrelated matter around 12:30 or 1:00 p.m. on April 30, 2014. At that time, he noticed a white *743 Cadillac with a blue landau top parked in front of the home. He went back to the Oak Hill address around 4:00 or 4:30 p.m. and again saw the white Cadillac in the driveway. Two black males dressed in Polo-type shirts and jeans were working on the Cadillac. He testified that shortly after he heard the dispatch about the shooting and that the suspect vehicle was a white Cadillac with a blue landau top, he again went to the Oak Hill address where he saw the Cadillac with the passenger door open. He said that the hood of the vehicle was warm.
Lieutenant Russell Severns, an investigator with the Garland County Sheriff's Department, was sent to 115 Oak Hill after the shooting to investigate. As he was photographing the Cadillac, he noticed vehicle fluid leading to the car and followed the trail of fluid on foot to the intersection of Oak Hill and Airport Road. He got in his car and followed the trail, which he said was not difficult to see. He said that the fluid trail did not follow the most direct route, but took a back way leading to the apartment complex at 200 Springwood. The fluid trail went past a Sonic Drive-In at the corner of Airport Road and Danna Drive.
Lieutenant Severns retrieved the video footage from the security cameras at the Sonic, which showed a white Cadillac with a blue top driving the wrong direction through the Sonic parking lot at 4:55 p.m. on April 30, 2014. Lieutenant Severns also interviewed a Sonic employee, Jordan Garner, who saw the Cadillac driving the wrong way through the parking lot at a high rate of speed between 4:30 and 5:00 p.m. that day. She thought it was odd and looked to see who was driving the car. Jordan testified at trial that she looked directly at the driver, whose eyes stood out to her. She said that there was another person in the car, but she did not look directly at him. The day after the shooting, she identified Swanigan as the driver from a photo lineup.
Lieutenant Joel Ware of the Garland County Sheriff's Department testified that he also observed liquid in the roadway at 115 Oak Hill and took a video of the fluid trail from there to the apartment complex on Springwood. The video was played for the jury.
Ciara Morgan testified that her child's father, who was a friend of Swanigan's, was in jail at the time of the incident. He had previously parked his white Cadillac with a blue soft top in her yard. She testified that Swanigan came to her workplace before 3:00 p.m. on April 30 and asked to borrow the Cadillac because he did not want to use his own car. She said that Swanigan and another man she did not know, whom she later identified in a photo lineup as Benjamin Pitts, arrived at her house on Oak Hill shortly after 3:00 p.m. She said that she gave Swanigan the key to the Cadillac and warned him that the car leaked power-steering fluid and had problems starting.
Bobby Humphries, a latent print, shoe, and tire examiner from the State Crime Laboratory, testified that he discovered three footwear impressions in Ciara Morgan's Cadillac, two partial ones on the passenger side and one complete print on the driver's floorboard. He testified that out of a shoe-print database containing over 32,000 shoes, the only match for the driver's side impression was a Ralph Lauren Polo sport boot. His report concluded that the "source of the [driver's side] impression could have been made by a Polo Sport Boot (by Ralph Lauren)."
Amanda Thornton testified that appellant had lived with her for about two weeks at the time of the shooting. She said that he had used one of her dresser drawers to store his belongings, where a box of *744 TulAmmo .45-caliber bullets was discovered in a search of her home. Amanda also said that Swanigan drove a Nissan Versa when he lived with her and that he wore Polo boots. On April 27, 2014, Amanda, Swanigan, and two others went to a shooting range. Swanigan shot an Uzi, a .40-caliber, a .45-caliber, and a 9-millimeter. She said that on April 29, Swanigan and Benjamin Pitts, whom she had not met until that day, took her to her court appearance and later picked her up. She said the last time she had seen Swanigan was on April 30, the morning of the shooting. He had come to the house, packed a suitcase, and told her that he would see her "in a couple of days." She also said that she gave police officers the phone numbers for two of Swanigan's cell phones: an Android touch-screen phone and a flip phone.
Lena Sanstra testified that she had known Swanigan for about sixteen or seventeen years. She said that she had loaned him a Nissan Versa in April 2014, and he had never returned it. The car belonged to Lauri Malott with whom Lena was living at the time.
Lieutenant Ware testified that he tracked Swanigan's cell phone to an Economy Inn in Conway where officers discovered the Nissan Versa. A search of the hotel room led to the discovery of a backpack containing cell phones, credit cards, a driver's license, and other items belonging to Swanigan. They also found the keys to the Versa and a .45-caliber semiautomatic handgun loaded with TulAmmo .45-caliber bullets. In a Walmart bag, officers found Federal Premium 9-millimeter ammunition along with a purchase receipt containing a time and date stamp of 8:03 p.m. on April 26, 2014, from the Walmart on Albert Pike in Hot Springs. The receipt also listed the register location, which was the sporting-goods counter. The Walmart receipt led officers to the discovery of a Walmart security video taken at the time provided on the receipt at the register, which was played for the jury. The video shows two black males purchasing the ammunition listed on the receipt, which included a box of TulAmmo .45-caliber shells, a box of TulAmmo .40-caliber shells, and a box of Federal 9-millimeter shells. A receipt from Trader Bill's, located across the street from the Albert Pike Walmart, was found in the Versa. The receipt reflected that Winchester 9-millimeter ammunition and targets were purchased at 8:26 p.m. on April 26, 2014.
Lieutenant Terry Threadgill participated in the investigation at the Economy Inn. He testified that he parked his car in the Waffle House parking lot adjacent to the motel parking lot. He saw Swanigan come out of the motel room, start down the stairs, and take off running. Lieutenant Threadgill said that he chased him but was not able to apprehend him.
Investigator Rhodes searched the contents of a cell phone discovered in the Conway motel room. The history on the phone showed an article from a Hot Springs paper about the shooting, a link to the official website of the Hot Springs Police Department, and a search of "police scanner" at 5:32 p.m. on April 30, 2014, a half hour after the shooting occurred. Investigator Rhodes also obtained photographs from Walmart of the persons who purchased the ammunition listed on the receipt found in the Conway motel: Swanigan and Benjamin Pitts.
II. Points on Appeal
A. Sufficiency of the Evidence
For his first point on appeal, Swanigan argues that the circuit court erred in refusing to grant his directed-verdict motion. A motion for a directed verdict is a challenge to the sufficiency of *745 the evidence. George v. State , 356 Ark. 345, 151 S.W.3d 770 (2004). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. Id. at 350-51, 151 S.W.3d at 773. Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. Id. at 351, 151 S.W.3d at 773. When reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. Jackson v. State , 363 Ark. 311, 315, 214 S.W.3d 232, 235 (2005). We do not weigh the evidence presented at trial, as that is a matter for the fact-finder. Harmon v. State , 340 Ark. 18, 22, 8 S.W.3d 472, 474-75 (2000). Witness credibility is also an issue for the fact-finder, who is free to believe all or a portion of any witness's testimony and whose duty it is to resolve questions of conflicting testimony and inconsistent evidence. Jackson v. State , 2011 Ark. App. 528, at 6, 385 S.W.3d 394, 397. Finally, circumstantial evidence can support a conviction; whether it does so is for the jury to decide. Lowry v. State , 364 Ark. 6, 16, 216 S.W.3d 101, 107 (2005).
Swanigan argues that the evidence was insufficient to prove that he was the shooter, that he was at the crime scene at the time of the event, or that he was connected to the Cadillac involved in the shooting. He argues that the State's case rested entirely on circumstantial evidence, which failed to create a reasonable inference that he was the shooter or present inside the Cadillac. Specifically, he argues that he presented two witnesses who testified that they saw another man, Valiquese Coger, driving a white Cadillac with a blue top into the apartment complex around the time of the shooting. He also claims that no witness identified him at trial as the shooter, and while he does not dispute the evidence that he borrowed a Cadillac similar to the one used by the perpetrators, he argues there was no substantial evidence that the car he used was the one involved in the shooting. He argues that the State's evidence did not exclude every other reasonable conclusion, chiefly that Swanigan was driving a different Cadillac than the one used in the shooting.
While there was evidence that excluded Swanigan-i.e., Swanigan's DNA was not found on a glove located in the road near the Sonic parking lot, in the Cadillac Ciara Morgan loaned to Swanigan, or at the crime scene-guilt may be established without either DNA evidence or eyewitness testimony, and evidence of guilt is not less because it is circumstantial. Jackson , 363 Ark. at 316, 214 S.W.3d at 236. The eyewitnesses to the crime in this case-Terrence, Antouin, and Joseph-testified that the shooter had his face covered except for his eyes, which Terrence and Joseph described as "bug eyes," and said only a few words. They also described the shooter as black, with dark skin, and slim. The jurors could see Swanigan in the courtroom, and a photo lineup containing Swanigan's photo was introduced into evidence for the jurors to view.
Terrence's neighbor, Natasha Jones, testified that the shooter drove up in a white Cadillac with a blue top that appeared to have a busted oil pan and repeatedly stalled as it was leaving the apartment complex. This description was confirmed by the video from the apartment complex. Swanigan does not dispute that he had borrowed Ciara Morgan's Cadillac around the time of the incident; he argues that the evidence did not demonstrate that Ciara's Cadillac was the one involved. Ciara Morgan testified that the Cadillac she loaned to Swanigan and Pitts shortly *746 before the shooting was leaking power-steering fluid and had trouble starting. She also said that Swanigan told her he needed the Cadillac because he did not want to use his own car. Evidence showed that Swanigan had possession of a Nissan Versa at this time. Finally, evidence was presented to the jury to show that the Cadillac involved in the shooting left fluid in the parking space at the apartment complex, and testimony and a video were introduced to demonstrate that a trail of fluid led from the apartment complex to Ciara Morgan's house. Although Swanigan argues that the state crime lab did not precisely identify the fluid or connect the substance found at Ciara Morgan's property, on the fluid trail, or at the crime scene to Ciara's Cadillac, the jury heard testimony from witnesses who followed the trail of fluid and viewed the video of the trail from Ciara's home to the crime scene. Ultimately, this is a factual question for the jury.
While Swanigan points to the testimony of two defense witnesses who testified that they saw Valiquese Coger driving a Cadillac through the apartment complex at the time of the shooting, credibility and weight to be given testimony is for the jury. Further, the State presented contradictory evidence from Kenny Ford, an investigator on the case. He testified that he obtained a surveillance video from a motel across town from the shooting taken on April 30 showing Coger and another individual being dropped off by a cab at 4:33 p.m. and walking around the motel courtyard at 5:23 p.m.
Jordan Garner identified Swanigan as the driver of a Cadillac like the one involved in the shooting that went the wrong direction through the Sonic parking lot, which was on the fluid-trail route, just five minutes before the incident. Further, several witnesses testified that Swanigan always wore Polo clothing and shoes, and an imprint of what the crime-lab expert testified matched a Polo sport boot was discovered on the driver's floorboard of Ciara's Cadillac after the shooting.
Evidence was introduced to show that several days before the shooting, Swanigan and Pitts purchased ammunition of the types and brand found at the crime scene: 9 millimeter of another brand than that at the crime scene, TulAmmo .45-caliber ammunition, and TulAmmo .40-caliber ammunition. TulAmmo .40-caliber expended shells were discovered at the scene. A box of TulAmmo .45-caliber shells was discovered in a drawer where Swanigan kept his belongings at Amanda Thornton's house. The TulAmmo .40-caliber bullets purchased by Swanigan and Pitts were not found. Further, Swanigan went to the shooting range with Amanda Thornton just three days before the shooting and shot four weapons: an Uzi, a .45 caliber, a 9 millimeter, and a .40 caliber. Officers later found an Uzi and a .45-caliber semiautomatic handgun in Swanigan's belongings, but the .40-caliber weapon and the 9 millimeter weapon that Swanigan took to the shooting range three days before the crime were never located. Finally, on the morning of the shooting, Swanigan packed a suitcase and told Amanda that he was leaving for a few days.
The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. Harper v. State , 359 Ark. 142, 152, 194 S.W.3d 730, 736 (2004). It is also the jury's duty to assess credibility and weight to be given to the testimony. Jackson , 2011 Ark. App. 528, at 6, 385 S.W.3d at 397. Jurors do not and need not view each fact in isolation but may consider the evidence as a whole. Price v. State , 2009 Ark. App. 664, at 2, 344 S.W.3d 678, 680-81. Finally, the jury is entitled to draw *747 any reasonable inference from circumstantial evidence to the same extent that it can from direct evidence. Id. We hold that substantial evidence supports the jury's verdict, and the circuit court did not err in submitting the question of guilt to the jury.
B. Suppression of Jordan Garner's Pretrial Identification
For his second point on appeal, Swanigan contends that the circuit court erred in denying his motion to suppress Jordan Garner's pretrial photo-lineup identification of him. He argues that the photo lineup was unduly suggestive and unreliable. Specifically, he claims that Garner said that Swanigan's photo "was not like any of the rest." Garner had informed Officer Severns the day before the lineup that the driver had dark skin and prominent eyes and that he was wearing a white shirt. He argues that only two of the six photos depicted men wearing white shirts; one of them was Swanigan. He also argues that none of the other photos were of men with prominent eyes and only one other photo was of a man with skin as dark as Swanigan's. He also contends that Garner had only a brief opportunity to see the driver as it sped through the parking lot.
It is for the circuit court to determine whether there are sufficient aspects of reliability present in an identification to permit its use as evidence. Milholland v. State , 319 Ark. 604, 607, 893 S.W.2d 327, 329 (1995). It is then for the jury to decide what weight that identification testimony should be given. Bishop v. State , 310 Ark. 479, 839 S.W.2d 6 (1992). We do not reverse a ruling on the admissibility of identification unless it is clearly erroneous, and we will not inject ourselves into the process of determining reliability unless there is a very substantial likelihood of misidentification. Williams v. State , 2014 Ark. 253, at 6, 435 S.W.3d 483, 486.
A pretrial identification violates the Due Process Clause when there are suggestive elements in the identification procedure that make it all but inevitable that the victim will identify one person as the culprit. Ray v. State , 2009 Ark. 521, at 7, 357 S.W.3d 872, 878. Reliability is the linchpin in determining the admissibility of identification testimony. Mezquita v. State , 354 Ark. 433, 440-41, 125 S.W.3d 161, 165 (2003). The circuit court looks at the totality of the circumstances in making a reliability determination, considering the following factors:
(1) the prior opportunity of the witness to observe the alleged act; (2) the accuracy of the prior description of the accused; (3) any identification of another person prior to the pretrial identification procedure; (4) the level of certainty demonstrated at the confrontation; (5) the failure of the witness to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the pretrial identification procedure.
Williams , 2014 Ark. 253, at 5, 435 S.W.3d at 486.
At a hearing on Swanigan's pretrial motion in limine to exclude the results of Garner's photo-lineup identification, Garner testified that she was almost struck by a fast-moving, older-model, white Cadillac with a blue top while she was working at Sonic.[1] She said that the car was going the wrong way through the one-way parking lot and she looked at the driver, who was looking at her, as the car passed. She said he was "really, really dark" and had "really, really like big eyes," and was wearing a white t-shirt. She *748 said she saw a front-seat passenger but did not look directly at him.[2] Garner said she was interviewed by officers about twenty or twenty-five minutes after her encounter with the Cadillac. She identified Swanigan as the driver in a photo lineup the next day. She said Officer Severns, who showed her the lineup, told her to pick a photo only if she recognized the person. Lieutenant Severns testified that Garner viewed the photos for a very short period of time before selecting a photo; she told him she was certain it was the driver.
We hold that the circuit court's determination that the identification was sufficiently reliable is not clearly erroneous. Garner testified that she looked directly at the driver, who was looking directly at her. She said she did not get a good look at the passenger. She described the car and the driver in detail to the officers within thirty minutes of witnessing the event. She made the photo identification of Swanigan the day after the event, and she did not identify the passenger in a different photo lineup she was presented several days later. The officer who presented the lineup to Garner said that Garner told him she was certain the person in the photo was the driver. These facts do not demonstrate that there is a substantial likelihood of misidentification; thus, we will not inject ourselves into the process of determining reliability. The weight to be accorded Garner's identification was for the jury to determine.
C. Evidentiary Admissions
For his third point on appeal, Swanigan challenges various rulings denying his motions in limine and allowing the State to introduce the evidence. Circuit courts are afforded wide discretion in evidentiary rulings. McCoy v. State , 354 Ark. 322, 325, 123 S.W.3d 901, 903 (2003). We will not reverse an evidentiary ruling absent an abuse of discretion. Hopkins v. State , 2017 Ark. App. 273, at 2, 522 S.W.3d 142, 144. Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. Owens v. State , 2017 Ark. App. 109, at 3, 515 S.W.3d 625, 627. In addition, we will not reverse absent a showing of prejudice, as prejudice is not presumed. Hopkins , 2017 Ark. App. 273, at 3, 522 S.W.3d at 144.
1. Weapons and ammunition
Swanigan first argues that the court abused its discretion in admitting evidence of guns and ammunition that were not demonstrated to have been used at the scene of the crime. He contends that the evidence was not relevant and that any probative value was outweighed by the danger of unfair prejudice. For evidence to be relevant, it does not have to prove the entire case; rather, all that is required is that it have "any tendency" to make any fact that is of consequence to the determination of the action more or less probable. Barrett v. State , 354 Ark. 187, 198, 119 S.W.3d 485, 492 (2003). Evidence may be relevant in connection with other facts or if it forms a link in the chain of evidence necessary to support a party's contention. Conte v. State , 2015 Ark. 220, at 31, 463 S.W.3d 686, 704. Relevant evidence is any evidence that aids in establishing the guilt or innocence of the accused, even though only a slight inference can be drawn from the evidence. Id. at 31, 463 S.W.3d at 705.
*749 Swanigan argues that an Uzi found at Amanda Thornton's home, where Swanigan was living at the time, was prejudicial and was not independently relevant. The Uzi was not introduced; the State introduced only a photo of Swanigan holding the Uzi found on his phone. Swanigan also contends that the .45-caliber gun found in the motel room in Conway was not relevant because it was not linked to the crime and was unfairly prejudicial and confusing to the jury. We hold that the circuit court did not abuse its discretion in admitting the evidence.
Evidence may be relevant and admissible if it forms a link in the chain of evidence necessary to support a party's contention and even when only a slight inference can be drawn from it. Id. Evidence was presented at trial from which the jury could have reasonably inferred that, on Saturday evening, April 26, 2014, Swanigan and Pitts purchased a box of 9-millimeter Federal ammunition, a box of .40-caliber TulAmmo ammunition, and a box of .45-caliber TulAmmo ammunition at Walmart and another box of 9-millimeter ammunition and a human target at Trader Bill's. The next day, Swanigan, Amanda Thornton, and two others went to the shooting range where they shot an Uzi, a .40-caliber firearm, a 9-millimeter firearm, and a .45-caliber firearm. Several photos of Swanigan holding the various weapons at the shooting range were introduced. One of these photos was of Swanigan holding the Uzi. Amanda testified that Swanigan brought the four guns to the shooting range in the trunk of his Versa and put them back in the trunk when they left the range. After the shooting, officers discovered an Uzi and a mostly empty box of .45-caliber TulAmmo ammunition at Amanda's house where Swanigan had been living, and they discovered a .45-caliber weapon loaded with .45-caliber TulAmmo bullets in Swanigan's Conway motel room. However, they did not find either the .40-caliber weapon or the 9-millimeter weapon Swanigan had used days earlier at the shooting range, and they did not find the .40-caliber TulAmmo bullets Swanigan had purchased at Walmart. These .40-caliber TulAmmo bullets were the type and brand of spent shells discovered at the crime scene.
This evidence showed that, of the four weapons Swanigan brought to the shooting range days before the shooting, officers found only two in Swanigan's belongings-the two that were not used in the crime. The evidence demonstrated that days before the shooting, Swanigan had possession of, and access to, both types of weapons used in the shooting, but neither of these guns was ever recovered. Evidence is relevant if it has "any tendency" to make any fact that is of consequence to the determination of the action more or less probable. Barrett , 354 Ark. at 198, 119 S.W.3d at 492 (holding that the test of admissibility of evidence over an objection for irrelevancy is whether the fact offered into proof affords a basis for rational inference of the fact to be proved and that it is sufficient if the fact may become relevant in connection with other facts, or if it forms a link in the chain of evidence necessary to support a party's contention). Because all of this evidence together could have led the jury to infer that Swanigan had disposed of the guns because they had been used in the crime, we hold that the circuit court did not abuse its discretion in admitting the evidence.
2. Purchases at Walmart and Trader Bill's
Swanigan next argues that the circuit court abused its discretion in admitting evidence that he purchased ammunition at Walmart and Trader Bill's just *750 days before the shooting. He contends that none of the ammunition purchased was directly linked to the ammunition used in the shootings and was thus not relevant and that any probative value was outweighed by the danger of unfair prejudice and misleading the jury. The State contends that Swanigan failed to object to this evidence at trial and thus waived the issue. Swanigan filed pretrial motions to exclude the evidence. When a pretrial motion in limine has been denied, the issue is preserved for appeal, and no further objection at trial is necessary. Glover v. Main St. Wholesale Furniture, LLC , 2018 Ark. App. 152, at 5, 545 S.W.3d 245, 248.
Swanigan purchased a variety of ammunition at the two stores just days before the incident, including 9-millimeter and .40-caliber bullets, the types found at the crime scene. At Walmart on the evening of April 26, Swanigan purchased a box of TulAmmo .45-caliber ammunition and a box of TulAmmo .40-caliber ammunition. TulAmmo .40-caliber casings were discovered at the crime scene. Although officers found a box of TulAmmo .45-caliber ammunition in Swanigan's belongings, they never found the box of TulAmmo .40-caliber bullets. Swanigan also purchased 9-millimeter ammunition at Trader Bill's on the morning of April 27. After these purchases, Swanigan went to the shooting range, where he fired both a .40-caliber weapon and a 9-millimeter weapon. Again, jurors do not view evidence in isolation but as a whole and may draw reasonable inferences from the evidence. Price , 2009 Ark. App. 664, at 2, 344 S.W.3d 678. We hold the circuit court did not abuse its discretion in admitting this evidence.
3. Nissan Versa and gloves
Swanigan also challenges admission of the fact that he was in possession of a Nissan Versa around the time of the shooting and that the vehicle was seen at Bumper to Bumper thirty minutes before the shooting. There, Benjamin Pitts purchased two pairs of white gloves, got in the passenger side of the Versa, and left. He argues that the gloves from Bumper to Bumper did not match a glove found in the Sonic parking lot and that the Versa's relevance rested upon the relevance of the gloves purchased at Bumper to Bumper.
We note that Swanigan's only objection was in a pretrial motion to exclude evidence of Swanigan's "alleged ties to a Nissan Versa." He argued that he was not the owner of the car, had no ties to it, and thus it was not relevant. He made no pretrial motions or objections at trial to the photo of the gloves purchased at Bumper to Bumper.
Carlos Cockman, the manager at Bumper to Bumper, testified that a man he later identified as Benjamin Pitts came into the store about 4:20 p.m. on April 30, 2014; paid cash for two pairs of gloves; and left without getting change or a receipt. He said the man got into the passenger side of the Versa, which remained parked for a while before leaving. He said most customers park by the front door, but the Versa was parked off to the side where the employees park their cars. He thought the situation seemed odd, so he got the license-plate number. After he heard about the shooting, he called the sheriff's department.
The Versa was connected to Swanigan by Lena Sanstra, and its relevance did not rest upon the relevance of the gloves purchased at Bumper to Bumper. It was relevant because it demonstrated that Swanigan had access to the Versa at the time of the shooting yet borrowed the Cadillac because he did not want to use his car and because the jury could have inferred that Swanigan and Pitts were together in the area a mere thirty minutes before the *751 crime. We also note that Swanigan did not make this precise argument about the gloves and the Versa to the circuit court. The circuit court did not abuse its discretion.
4. Fluid trail
Finally, Swanigan argues that the circuit court abused its discretion in admitting evidence about the "fluid trail" leading from the crime scene to Ciara Morgan's home, including the video of the fluid trail. He argues that it was irrelevant and created a danger of unfair prejudice and confusion of the issues. Specifically, he contends that there was no proof that the fluid was power-steering fluid from Ciara Morgan's Cadillac and that there was no fluid trail in the Sonic parking lot.
When Swanigan borrowed the Cadillac from Morgan, she told him it leaked power-steering fluid and had trouble starting. At the scene of the shooting, Natasha testified that the shooter's car seemed to have a busted oil pan and repeatedly stalled as it was leaving. Testimony indicated that the fluid trail was readily visible, it was observed and videoed immediately after the crime, and it led from Morgan's home directly to the scene of the crime.
Swanigan asks us to weigh this evidence. We do not weigh the evidence presented at trial, as that is a matter for the jury. Harmon , 340 Ark. at 22, 8 S.W.3d at 474-75. We hold that the circuit court did not abuse its wide discretion in admitting this evidence.
D. Right to Cross-Examine Officer Wright about Embezzlement
For his fourth point on appeal, Swanigan contends that the circuit court abused its discretion in refusing to allow him to cross-examine one of the State's witnesses about his alleged embezzlement. At a pretrial hearing, Swanigan argued that he should be allowed to question Michael Wright, the Garland County sheriff's deputy who acted as evidence custodian at the time of the shooting, about why he was no longer employed as a law-enforcement officer. At the time of the trial in this case, Wright was under investigation and had admitted to embezzling money from the Arkansas Narcotics Officers Organization. The court ruled that Swanigan could not use the prior bad act of embezzlement to impeach Wright under Arkansas Rule of Evidence 609 because there had been no conviction or under Rule 608 because embezzlement was not probative of truthfulness.
Arkansas Rule of Evidence 608(b) allows specific instances of conduct to be used to impeach a witness's credibility under the following circumstances:
(b) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
Ark. R. Evid. 608 (2018). We specifically held in Sitz v. State , 23 Ark. App. 126, 128, 743 S.W.2d 18, 20 (1988), that embezzlement, a form of theft, is not a crime that is probative of untruthfulness and thus is not admissible under Rule 608(b). See also Arendall v. State , 2010 Ark. App. 358, at 19, 377 S.W.3d 404, 416. We decline Swanigan's *752 invitation to revisit this decision, and we do not find the present case to be distinguishable. Accordingly, the circuit court did not abuse its discretion in refusing to allow the evidence.
E. Mistrial
Swanigan's fifth point on appeal is that the circuit court abused its discretion by denying his motion for mistrial after Amanda Thornton testified that Swanigan had been "incarcerated for a while." Swanigan had been living with Amanda at the time of the shooting. At the start of her testimony, after asking her to state her name, the prosecutor asked Amanda how long she had known Swanigan. She testified that she had known him since she was twelve or thirteen years old. The prosecutor then asked her if she had kept up with him since that time. She replied, "Not really. He was in-yes, to a point I have. He was incarcerated for a while, so ...." The examination then continued without objection:
PROSECUTOR : So you've known him since you were a child. I'm going to take you back to April of 2014. Where were you living at that time?
THORNTON : On Frona.
PROSECUTOR : I'm sorry?
THORNTON : On Frona Street.
PROSECUTOR : Frona. And who was living with you?
THORNTON : Me and my son, and [Swanigan], occasionally.
PROSECUTOR : And about what time or about what part of the month of April did he start living with you?
THORNTON : Towards the end of it probably-or the middle.
PROSECUTOR : Towards the middle of April. And about how long did he live with you?
THORNTON : Maybe two weeks.
PROSECUTOR : And did he move any clothing in or any items?
THORNTON : Yeah. He had his own closet with his clothes and belongings in it.
PROSECUTOR : May we approach?
At that point, the prosecutor told the court that she had made it clear to Amanda the day before not to discuss "certain things." The prosecutor said she thought a recess would be appropriate to admonish her witness one more time "so she doesn't say something she shouldn't." Swanigan's counsel said he thought that "was a good idea." The court took a five-minute recess, after which it informed the jury that there had been some problems hearing the witness, and her testimony would be started over. Swanigan's counsel then requested a bench conference, arguing that Amanda's mentioning Swanigan's incarceration was inadmissible and overly prejudicial. He requested a mistrial, which the court denied. The prosecutor then began Amanda's testimony from the beginning.
A mistrial is a drastic remedy that should be ordered only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when fundamental fairness of the trial itself has been manifestly affected. Britton v. State , 2014 Ark. 192, at 9, 433 S.W.3d 856, 862. A circuit court has wide discretion in granting or denying a mistrial motion, and absent an abuse of that discretion, the court's decision will not be disturbed on appeal. Id. at 10, 433 S.W.3d at 862. Further, a motion for mistrial must be made at the first opportunity. Ellis v. State , 366 Ark. 46, 49, 233 S.W.3d 606, 608 (2006). The reason for this is that a circuit court should be given an opportunity to correct any perceived error before prejudice occurs. Id.
The State contends that Swanigan's argument is not preserved for appeal *753 because his motion for mistrial was untimely. We agree. In this case, Swanigan did not object when the allegedly offensive statement was made. In fact, the prosecutor asked four more questions before she herself stopped the testimony and asked for a recess to remind the witness what not to mention. Even then, defense counsel merely added that he thought it "was a good idea." It was not until after the five-minute recess and the court had informed the jury that it was going to have the State start over with Amanda's testimony that defense counsel requested a mistrial, which the court denied. The circuit court did not abuse its discretion.
F. Rebuttal Evidence
Finally, Swanigan contends that the circuit court abused its discretion in admitting rebuttal evidence by allowing the State to present evidence that did not refute the defense's evidence but that impeached a defense witness on a collateral matter the State itself elicited on cross-examination. He argues that the State failed to include the witness on its witness list, violating Rule 17.1 of the Arkansas Rules of Criminal Procedure ; the evidence did not refute any portion of Amy Bostick's testimony; and therefore, while perhaps admissible during the State's case-in-chief, it was not proper rebuttal evidence.
Rebuttal evidence is evidence that is offered in reply to new matters, even if it overlaps with the evidence presented in the State's case-in-chief, as long as the testimony is responsive to evidence presented by the defense. Kincannon v. State , 85 Ark. App. 297, 303, 151 S.W.3d 8, 12 (2004). The scope of a rebuttal witness's testimony is accorded wide latitude and will not be restricted merely because it could have been presented on direct examination. Id. It is within the circuit court's discretion whether to admit rebuttal testimony, and the appellate court will not reverse this determination absent an abuse of that discretion. Jackson v. State , 2015 Ark. App. 603, at 7, 474 S.W.3d 525, 530. The discretion of the circuit court in refusing the testimony of a rebuttal witness is narrow and is more readily abused by excluding the testimony than by admitting it. Id.
The defense called Amy Bostick to provide an alibi for Swanigan. She testified that Swanigan was taking a shower at her house at the time of the shooting. She remembered this because she was listening to a police scanner on her phone while he was showering and heard about the shooting. On cross-examination, she said that she had not had contact with Swanigan lately. She also denied having been on a three-party telephone call with Swanigan from jail, although she admitted that her boyfriend had called her and told her to say "hi" to Swanigan. She also testified that she had not talked about her testimony with Swanigan or received a letter from him about her testimony.
The State then attempted to call Scarlett Shurett as a rebuttal witness to introduce a letter written by Swanigan to Bostick instructing Bostick how to testify. Swanigan had given the letter to Shurett, who had turned it over to the prosecutor. Defense counsel argued that Bostick had never received the letter and thus it was not admissible to impeach her testimony. After a lengthy discussion, the court denied the State's request to introduce it. Defense counsel stated that Shurett could testify as long as her testimony was "appropriately limited to what [Bostick] apparently denied without putting an entire letter in that Amy Bostick didn't receive." The court agreed, finding that it was limited to impeachment to rebut Bostick's testimony that she "had never talked to Swanigan about how she was to testify."
The State then attempted to have Shurett introduce the recording of a three-way *754 telephone call between Shurett, Swanigan, and Bostick on October 1, 2017. The court and counsel listened to the entire phone call, during which defense counsel argued that parts of the call were not relevant. The court and counsel agreed to the parts that could be played for the jury to impeach Bostick's testimony that she had not spoken with Swanigan about her testimony. The following part of the phone call was played for the jury:
SWANIGAN : But I'm just trying to get all my shit squared away. If, you know what I'm saying, maybe I'm gonna talk to him Monday, but you still straight and I'm saying that we need you get up there and say whatever?
BOSTICK : Yeah. Of course.
SWANIGAN : As far as who lived where, what was going on at the house, all that type of shit. You know what I'm saying?
BOSTICK : Yeah, Yeah, yeah, yeah, yeah. Just write me a letter.
SWANIGAN : That--
BOSTICK : Let me know.
The State introduced the recording, which was admitted without objection.
We reject Swanigan's arguments on appeal. He did not make these arguments to the circuit court. He neither mentioned Rule 17.1 nor argued that the State was attempting to impeach improperly. The court made no ruling on any such arguments. Moreover, Bostick testified that she had not spoken with Swanigan about her testimony. The phone call suggested that she had. We hold that the circuit court did not abuse its discretion in admitting the evidence.
Affirmed.
Abramson and Harrison, JJ., agree.

The video from Sonic of the Cadillac in the parking lot was played for the jury.

She did not identify the passenger when shown a photo lineup that included a photo of Benjamin Pitts several days later.