Cite as 2021 Ark. App. 134

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CR-20-358

|  |  |
|---|---|
|  | **Opinion Delivered** March 17, 2021 |
| MELISSA ROSE HATLEY<br>APPELLANT | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT [NO. 16JCR-19-703 ] |
| V. |  |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE CINDY THYER, JUDGE |
|  | AFFIRMED |

### WAYMOND M. BROWN, Judge

A Craighead County jury convicted appellant of attempted first-degree murder and sentenced her to twenty-five years' imprisonment. She argues on appeal that the evidence was insufficient to support her conviction and that the circuit court erred when it did not allow her to present a jury instruction on attempted manslaughter based on extreme emotional distress. We affirm.

Appellant was charged by criminal information with attempted first-degree murder on June 21, 2019, following events that took place at Walmart, located on Highland Drive in Jonesboro, Arkansas, on May 22. On this date, officers from the Jonesboro Police Department were dispatched to Walmart around 5:30 p.m. in reference to a female, later identified as appellant, running over another female, identified as Amy Keller, twice with

her vehicle and then proceeding to get out of the vehicle and choke Keller with a lanyard. Appellant had to be restrained twice by witnesses until the police arrived.

Appellant's jury trial took place on February 21, 2020. Delilah Miller, an asset-protection manager at Walmart, testified that on the date in question, she heard over the walkie talkie that a customer had been struck by a vehicle in the parking lot. She stated that she ran to the parking lot and found a vehicle on top of the mulch and three customers on top of a lady. She testified that she heard the lady yelling, "Get off me, get off me, I'm going to kill her." She said that by the time she arrived outside, Keller was sitting on a pile of mulch. Miller testified that the incident was recorded on video and that she subsequently burned copies for the Jonesboro Police Department and for Walmart. The inaudible video was then played before the jury.

Nathan Freeman testified that he was in Walmart's parking lot when he witnessed a woman getting hit by a vehicle. He stated that he ran over to pull appellant out of the vehicle, but he fell. According to Freeman, by the time he got up, appellant was outside the vehicle and under the car attempting to choke Keller with a lanyard. He stated that he and a "couple more guys" pulled appellant off Keller and pinned her to the ground until the police arrived. He testified that he initially thought appellant had just hit the mulch due to bad driving, but he saw Keller stand up after appellant reversed the vehicle. He said that appellant then put the vehicle back in drive and hit Keller. He stated that as they were pulling appellant off Keller, appellant was yelling that she "was going to kill the bitch." On cross-examination, Freeman stated that appellant "seemed like she might have been out of it" and as if she was under the influence.

Victoria Vickers, Freeman's fiancée, testified that she had been in the parking lot with Freeman on May 22 when she noticed that a vehicle had run into the mulch. She stated that she saw Keller stand up in front of the vehicle after it reversed. She testified that appellant then drove forward to hit Keller again and "drove into the mulch over the woman." She stated that she called 911 to report the accident and then walked over to the area where the incident had taken place. She said that once she got over to the vehicle, she saw Freeman and "other people" pulling appellant "off the woman underneath the car." She also stated that she heard appellant say that she was going to kill Keller. Vickers testified that appellant seemed "very manic" and as if she "may have been on something." She stated that appellant was very angry and aggressive. On cross-examination, Vickers described "manic" as "[n]ot quite normal, extra aggressive, not quite in her right mind."

Rosie Dennis testified that she had been at Murphy's gas station in front of Walmart when she witnessed two females in a vehicle "bickering." She stated that she saw one of the females get out and begin to walk away when appellant "bumped her, at first." She said that Keller tried to get away by jumping over the "dirt piles" when appellant reversed but that appellant accelerated over the piles at Keller. She said that she called 911 and then she and the others in the car with her went over there. Dennis testified that as Keller was trapped under the vehicle, appellant jumped out of the vehicle with a "string object" in her hand, got under the vehicle, and put the object around Keller's neck like she was choking her. She stated that witnesses pulled appellant off Keller, but appellant got away from them and began choking Keller again. She said that more men came and helped pull appellant off Keller and pinned her down. She stated that another witness began pulling "dirt bags"

3

off Keller and pulled her from under the vehicle. She testified that from what she could see, the vehicle was on top of the dirt, and the dirt was on top of Keller. She stated that appellant was yelling Keller's name and saying she was going to kill Keller. On cross-examination, Dennis stated that the dirt piles were what kept appellant's vehicle from being on top of Keller's body. She said that appellant was very angry.

Officer Evan Henry of the Jonesboro Police Department testified that he was dispatched to Walmart on May 22. He stated that when he got there, he saw a large crowd of people and an SUV sitting vertically on top of a pile of mulch. He said that he eventually noticed a female being held down by two men. He stated that appellant seemed angry when he took her into custody. He said that he could smell the intoxicants coming from her body. He stated that he was handed a lanyard by another officer at the scene.[1] He admitted on cross-examination that he had described Keller's injuries as minor scrapes on the right elbow and as a hurting right leg.

Officer James Chambers of the Jonesboro Police Department testified that he also was dispatched to Walmart on May 22. He stated that he collected the lanyard—which had appellant's work ID attached—at the scene and gave it to Officer Henry. On cross-examination, he stated that he was handed the lanyard by someone at the scene.

Detective Chad Hoggard of the Jonesboro Police Department testified that he attempted to interview appellant on May 22, but he deemed her too impaired for a statement after he smelled intoxicants coming from her body. On cross-examination, he testified that

---

[1]Freeman was subsequently recalled and identified the lanyard as the one appellant had used to choke Keller.

4

he interviewed Keller the same day and that he did not notice any red marks on, or injuries to, her neck.

Keller testified that she and appellant had been together for about seven years at the time of the accident. She stated that the two of them had been living together in motels in May 2019. She said that she and appellant slept in the vehicle in Hayti, Missouri, the night of May 21. She stated that the following morning, they took a shower and ate at a truck stop and then drove to Kennett, Missouri, and had lunch. She testified that she had to be at work in Jonesboro by 6:00 p.m. She stated that they had approximately eighteen cans of Truly sparkling alcohol, of which she drank one and appellant drank the rest. She said that they subsequently stopped at a liquor store on the border of Arkansas and Missouri and purchased "two airplane bottles of liquor," which appellant consumed. She stated that one was moonshine and the other was whiskey.

Keller testified that once they made it to Jonesboro, appellant began driving around erratically. She stated that they argued because appellant continued to drive drunk. She said that they eventually pulled into Walmart's parking lot where appellant told her to go inside and get dressed for work. She stated that she informed appellant that she was already dressed, and she was not going to keep riding around with appellant. She testified that she got out of the vehicle and began to walk away. She stated that appellant began blowing the horn, so she walked back to the vehicle to tell appellant to stop before someone called the police, and then walked away. She stated that she walked close to the mulch because she "felt like [appellant]would attempt to run [her] over." She testified that when she heard appellant put the vehicle in reverse, she looked out of the corner of her eye and saw that

5

appellant was heading in her direction. She stated that she "hurriedly edged as close as [she] could to the mulch." She said that appellant then hit her with the vehicle and pinned her against the mulch. She stated that she yelled to appellant that she had just hit her and that appellant needed to go to a hotel and lie down. She stated that she attempted to climb over the stack of mulch, and that is when appellant drove on top of her with the vehicle's two front tires and then reversed and backed over her again. She testified that appellant then backed up about twenty feet, accelerated, hit her "head-on," and drove on top of the stack of mulch, which was over three feet high. She stated that the vehicle drove over both her legs and up the right side of her body. She said that the vehicle almost drove over her head. She testified that she was pinned under the rear tires of the vehicle and that the vehicle was stuck on top of her. She stated that she was buried in mulch, and she was unable to move. She said that she heard people yelling and running in her direction, but she could not see them. She stated that she then saw appellant approaching on her right and thought appellant was coming to see about her. However, she stated that appellant placed a lanyard around her neck and began to tighten it while asking, "Why won't you just die?" She stated that she felt air deprived but that she did not lose consciousness. She said that she asked a "gentleman" to help her because appellant was trying to kill her. She stated that the man pulled appellant from under the vehicle but that appellant "struck" him in the face and attempted to climb back under the vehicle. She said at that time the man and another "bystander" grabbed appellant by her legs and pulled her from under the vehicle. The video was subsequently played, and Keller walked the jury through what was taking place. Keller testified that when she got out from under the vehicle, she noticed that she had a large

6

abrasion on the front of her right lower leg and multiple scrapes and burn marks. She stated that she did not seek medical treatment initially and that she actually went to work after she left the police station. She testified that she subsequently had severe upper right abdominal pain for which she sought medical treatment.

Keller testified that she and appellant had argued off and on for several months prior to May 22 about homelessness and appellant's unemployment status. She admitted that before she got out of the vehicle, she and appellant were arguing "extensively" and were yelling and screaming at each other. However, she denied that she had threatened appellant with words or a weapon on May 22.

On cross-examination, Keller admitted that she had threatened appellant in the past, and that as recently as two weeks prior to the accident, she had threatened appellant with physical violence. She also admitted telling appellant in January 2019 that she did not care if appellant lived or died. She said that there was a lot of physical violence between her and appellant during their relationship. She agreed that they were passionate when they fought. She stated that they often fought over finances, homelessness, and appellant's overuse of alcohol. Keller testified that although she had primarily been the sole financial provider since 2014, she had to turn her money over to appellant. She stated that on May 22, she told appellant that she hated her and that she drank too much. She said that their argument lasted about fifteen minutes. She stated that she feared appellant might try to hit her with the vehicle because appellant was "unpredictable when she's angry." She testified that appellant had recently started a new medication that caused her to be sleepy all the time and made her seem confused at times.

7

At the conclusion of the State's case, appellant unsuccessfully moved for a directed verdict based on culpable mental state and the substantial-step element of the charge. Appellant unsuccessfully renewed the motion after she rested without putting forth any evidence. Appellant also unsuccessfully sought to have the jury instructed on attempted manslaughter based on extreme emotional distress. The jury returned a verdict of guilty, and appellant was sentenced to the Arkansas Department of Correction for twenty-five years. The sentencing order was filed on February 24, 2020. This timely appeal followed.

For her first point on appeal, appellant argues that the evidence was insufficient to support her conviction. More specifically, she contends that the State failed to offer sufficient evidence that she took a substantial step to cause the death of another person. The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial.[2] Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture.[3] When reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in the light most favorable to the verdict, and only evidence supporting the verdict will be considered.[4] We do not weigh the evidence presented at trial, as that is a matter for the fact-finder.[5] Witness credibility is also an issue for the fact-finder, who is free to believe all or a portion of any witness's testimony and whose duty it is to resolve questions of

---

[2]*Swanigan v. State*, 2019 Ark. App. 296, 577 S.W.3d 737.

[3]*Id.*

[4]*Jackson v. State*, 363 Ark. 311, 214 S.W.3d 232 (2005).

[5]*Harmon v. State*, 340 Ark. 18, 8 S.W.3d 472 (2000).

8

conflicting testimony and inconsistent evidence.[6]   Finally, circumstantial evidence can support a conviction; whether it does so is for the jury to decide.[7]

A person commits first-degree murder if "with a purpose of causing the death of another person, the person causes the death of another person[.]"[8]   Attempted first-degree murder requires the State to prove beyond a reasonable doubt that the defendant intended to commit the offense of first-degree murder and that the defendant "purposely engaged in conduct that was a substantial step in a course of conduct intended to culminate in the commission" of first-degree murder.[9]   To be considered a "substantial step," conduct must be strongly corroborative of the person's criminal intent.[10]

Appellant relies on *Davis v. State*[11] for her contention that the State failed to prove she had the specific intent to kill.  At trial, Keller and the witnesses recounted how appellant hit Keller, not once, but twice with her vehicle.  After the vehicle was stuck and could not be moved, appellant got out of the vehicle and used her lanyard to choke Keller requiring bystanders to remove her twice and subsequently pin her down until the police arrived. Testimony shows that both during and after these events, appellant was threatening to kill Keller and questioning why Keller would not die.  It is presumed that a person intends the

---

[6]*Jackson v. State*, 2011 Ark. App. 528, 385 S.W.3d 394.

[7]*Lowry v. State*, 364 Ark. 6, 16, 216 S.W.3d 101, 107 (2005).

[8]Ark. Code Ann. § 5–10–102(a)(2) (Supp. 2019).

[9]AMI Crim. 2d 501; *see* Ark. Code Ann. § 5–3–201(a)(2) (Supp. 2019).

[10]Ark. Code Ann. § 5–3–201(c).

[11]115 Ark. 566, 173 S.W. 829 (1914).

natural and probable consequences of his or her conduct.[12]  Additionally, the jury was able to watch a video of what took place on May 22.  A jury is entitled to draw on common sense and experience in reaching its verdict.[13]  The State presented sufficient evidence by which the jury could conclude that appellant entertained the specific intent to kill and took the steps necessary to carry out that intent.  Therefore, we cannot say that the court erred by denying appellant's directed-verdict motion.

Appellant also argues that the circuit court erred when it did not allow her to present a jury instruction on attempted manslaughter based on extreme emotional distress.  A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction.[14]  An instruction should be excluded when there is no rational basis for giving it.[15]  A circuit court's decision whether to give an instruction will not be reversed unless the court abused its discretion.[16]  Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration.[17]  A party is entitled to an instruction on a defense or a lesser-included offense

---

[12]*Terrell v. State*, 2019 Ark. App. 433, 587 S.W.3d 594.

[13]*Worsham v. State*, 2017 Ark. App. 702, 537 S.W.3d 789.

[14]*Vidos v. State*, 367 Ark. 296, 239 S.W.3d 467 (2006).

[15]*Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003).

[16]*Vidos*, *supra*.

[17]*Dixon v. State*, 2011 Ark. 450, 385 S.W.3d 164.

if there is sufficient evidence to raise a question of fact or if there is any supporting evidence for the instruction.[18]

Appellant proffered a jury instruction on attempted extreme-emotional-disturbance manslaughter. We have held that extreme-emotional-disturbance manslaughter is a lesser-included offense of first-degree murder.[19] A person commits this formulation of manslaughter if "[t]he person causes the death of another person under circumstances that would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse."[20] A jury instruction on attempted extreme-emotional-disturbance manslaughter requires evidence that the defendant attempted to kill the victim following provocation such as "physical fighting, a threat, or a brandished weapon."[21] Anger alone will not reduce a homicide from murder to manslaughter.[22]

While appellant asks us to align ourselves with the dissenting justice in *Douglas v. State*[23] and with *Dixon*,[24] we are bound to follow precedent as stated by the majority of the Arkansas Supreme Court in those cases. Based on precedent, provocation such as physical

---

[18]*Norris v. State*, 2010 Ark. 174, 368 S.W.3d 52.

[19]*See, e.g.*, *Dixon v. State*, 2019 Ark. 245, 581 S.W.3d 505.

[20]Ark. Code Ann. § 5-10-104(a)(1)(A) (Repl. 2013).

[21]*Johnson v. State*, 2016 Ark. 156, 489 S.W.3d 668.

[22]*Spann v. State*, 328 Ark. 509, 944 S.W.2d 537 (1997).

[23]2019 Ark. 57, 567 S.W.3d 483.

[24]*Supra*.

fighting, a threat, or a brandished weapon must immediately proceeded a defendant's actions before an instruction on extreme-emotional-disturbance manslaughter can be given. The facts of this case did not warrant such an instruction as there was no indication that Keller provoked appellant. The evidence clearly showed that appellant was angry, manic, and seemed to be under the influence of something; however, her anger and manic behavior were not the result of being provoked by Keller in the manner required by our precedent. Accordingly, the circuit court did not err when it denied appellant's request for the lesser-included-offense jury instruction because there was no rational basis for the instruction.

Affirmed.

HARRISON, C.J., and HIXSON, J., agree.

*Terry Goodwin Jones*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Jason Michael Johnson*, Ass't Att'y Gen., for appellee.